IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | § § § | |
| Petitioner, | § § | |
| v. | § § | CIVIL ACTION NO. 3:26-MC-009-N-BW |
| GENUINE PARTS COMPANY d/b/a NAPA Auto Parts, | § § § | |
| Respondent. | § § § | |

**RESPONDENT'S RESPONSE AND OBJECTIONS TO PLAINTIFF'S APPLICATION TO ENFORCE ADMINISTRATIVE SUBPOENA AND BRIEF IN SUPPORT THEREOF**

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     FACTUAL BACKGROUND ........................................................................... 3

    A.   *The Commissioner's Charge and GPC's Response*........................................... 3

       B.   *The Requests for Information and GPC's Responses* ..................................... 5

       C.   *The Subpoena and GPC's Response and Attempts to Resolve Disputes.* ...................11

       D.   *GPC's Localized, Autonomous Hiring Process* ............................................. 13

       E.   *Burden Associated with Complying with the Subpoena Data Requests* ................... 15

III.    ARGUMENT: EEOC's Application for Subpoena Enforcement Should be Denied or Modified to be Consistent with the Commissioner's Charge .................................... 16

    A.   *The temporal scope of the subpoena is excessive and should be limited* ...................... 18

    B.   *Pay data is irrelevant to the allegations of the Charge, and thus the investigation* ...... 21

    C.   *Past complaints should be limited to failure to hire or recruit on the basis of race (Black), and a search of reasonably accessible sources* ........................................... 23

    D.   *The data sought in Attachment B is overly broad and unduly burdensome* ................. 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*E.E.O.C v. Maritime Autowash, Inc.*,
  820 F. 3d 662 (4th Cir. 2016) ........................................................................................17

*E.E.O.C. v. United Air Lines, Inc.*,
  287 F.3d 643 (7th Cir. 2002) ...............................................................................16, 17, 24

*EEOC v. BASF Corp.*,
  2003 WL 21219038 (E.D. Mo. 2003)...........................................................................24

*EEOC v. Bass Pro Outdoor World, LLC*,
  884 F. Supp. 2d 499 (S.D. Tex. 2012) ..........................................................................18

*EEOC v. K-Mart Corp.*,
  694 F.2d 1055 (6th Cir. 1982) .....................................................................................16

*EEOC v. Packard Electric Div.*,
  569 F.2d 315 (5th Cir. 1978) .......................................................................................24

*EEOC v. Shell Oil. Co.*,
  466 U.S. 54 (1984)...............................................................................................16, 22

*Gillum v. ICF Emergency Mgmt. Servs., L.L.C.*,
  No. CIV.A. 08-314-C-M2, 2009 WL 2136269 (M.D. La. July 16, 2009) .......................23, 24

*Manning v. Chevron Chem. Co., LLC*,
  332 F.3d 874 (5th Cir. 2003) .........................................................................................4

*Sunshine Gas Co. v. U.S. Dep't of Energy*,
  524 F. Supp. 834 (N.D. Tex. 1981) ...............................................................................17

**Statutes**

29 C.F.R. § 1602.14 ...........................................................................................................7

42 U.S.C. 2000e-5...........................................................................................................18

42 U.S.C. §§ 2000e-5 and 2000e-6...................................................................................3

Civil Rights Act of 1964 Title VII Sections 706 and 707................................................3

**Other Authorities**

Commission Opinion Letter: Section 707 (Sept. 3, 2020), available at
https://www.eeoc.gov/laws/guidance/commission-opinion-letter-section-707 .......................18

Federal Rules of Civil Procedure Rule 26 .....................................................................................16

https://jobs.genpt.com ...............................................................................................................14, 15

What Researchers Discovered When They Sent 80,000 Fake Résumés to U.S.
Jobs," *available at* https://www.nytimes.com/2024/04/08/upshot/employment-
discrimination-fake-resumes.html (last visited Mar. 16, 2024)...................................................5

EEOC Chair Issues Reminder Letter to Fortune 500 Regarding Title VII
Compliance Related to DEI Initiatives, *available at*
https://www.eeoc.gov/newsroom/eeoc-chair-issues-reminder-letter-fortune-
500-regarding-title-vii-compliance-related-dei (last visited Mar. 8, 2026)...............................3

COMES NOW Genuine Parts Company d/b/a NAPA Auto Parts ("Respondent" or "GPC") and files its Response and Objections to Plaintiff's Application to Enforce Administrative Subpoena, respectfully requesting that the Court consider its objections and concerns.

## I.      INTRODUCTION

This case is before the Court on the application by the United States Equal Employment Opportunity Commission for an Order to enforce an Administrative Subpoena. While the EEOC's application attempts to paint GPC as unwilling to cooperate with the Commission's investigation, that is not the case. First, GPC has provided the EEOC with hundreds of pages of documents, written responses, and data files in response to the RFIs that preceded the Subpoena, in addition to dozens of pages of explanation, objections and responses to the Subpoena, demonstrating its commitment to equal employment opportunity for all applicants. Second, GPC has repeatedly engaged with the EEOC to understand the basis for its expansive requests that EEOC contend relate to "company-wide race discrimination in hiring and recruitment," but which include requests entirely unrelated to those allegations. *See* ECF No. 1-1 at 5.[1] The individual nature of hiring decisions made at thousands of GPC-owned retail stores and distribution centers, involving thousands of different decisionmakers and tens of thousands of job postings for which **hundreds of thousands of applications were submitted** over more than six years, results in the Subpoena requiring a massive undertaking for GPC to comply with requests not even tailored to the only issues in the Commissioner's Charge underlying the Subpoena: "[f]ailure to recruit Black candidates… [and f]ailure to hire Black candidate on the basis of their race."

The Charge makes no allegations regarding the treatment of GPC *employees*, compensation, promotional opportunities, termination decisions, or any protected category other

---

[1] In citing to the EEOC's Memorandum of Law, GPC cites the pagination assigned by the court's ECF system.

than race, despite the EEOC seeking such data, including: pay and benefits of every GPC *employee* at any retail store or distribution center for more than six years (Item 7); complaints of discrimination on the basis of race, *national origin*, *or color* (not limited to recruiting/failure to hire) from applicants *or employees*, including a full narrative description of the circumstances and all related documents (Item 8); analyses of the racial *or national origin* composition of the company's applicants, hires, *or employees* (Item 9); 137 different data fields from the Workday system regarding more than 631,000 applications and 42,666 *employees*,[2] including the applicants' and all *employees'* date of birth (*age*), *ethnicity*, *sex*, and contact information (including home address, phone numbers, and email) (Section B); 42 different data fields regarding more than 365,000 applications from the Jobvite applicant tracking system that EEOC is aware GPC retired in 2023,[3] including the applicants' *ethnicity*, *sex*, contact information (home, mobile, and work phone numbers, home address, and email) (*id.*); and 25 different data fields from the PeopleSoft system——*which houses only employee and not applicant data*——from October 2019 to June 2023[4] including *employees' entire job history* of every position held at the Company, their race and EEO-1 category, their *personal and home phone number and email*, identifying whether they are managers, and information regarding their *termination* (*id.*).

GPC has attempted to partner with the EEOC to comply with the EEOC's <u>impartial</u> investigation powers into allegations of discrimination. It should go without saying that the Commissioner's Charge contains nothing more than bare allegations, which are vehemently disputed by the Company. And yet the EEOC's approach has been adversarial and their arguments to this Court appear to prejudge the issues. While the EEOC is entitled to necessary information

---

[2] *See* Exhibit 1 (Declaration of Nadine Santana ("Santana Decl."), ¶ 11.
[3] Santana Decl. ¶ 9.
[4] Santana Decl. ¶ 7.

to investigate the allegations in the Commissioner's Charge, the Subpoena takes a scattershot approach beyond its own defined scope of the investigation, in an impermissible fishing expedition for unrelated information. GPC simply requests that the EEOC tailor its voluminous requests to information necessary to investigate the allegations of the Charge.

## II.    FACTUAL BACKGROUND

Since 1928, GPC has been a leading service provider of automotive and industrial replacement parts across North America, Europe, and Australasia. GPC prides itself on being an equal opportunity employer, providing opportunity for growth and development of all employees, and seeking the most-qualified candidates from a wide range of applicant sources for its roles.

### A.    *The Commissioner's Charge and GPC's Response*

On May 20, 2024, EEOC Commissioner Kalpana Kotagal issued a Commissioner's Charge pursuant to Sections 706 and 707 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5 and 2000e-6. *See* ECF No. 1-3 at 1. That Charge alleges vaguely that since October 2019 – nearly five years before the Charge was issued – GPC "may have violated, and may continue to violate Title VII, based on race." *Id.* The only clarifying detail provided in the Charge is that the Commissioner asserts that some unknown "unlawful discriminatory practice" led to GPC's alleged "[f]ailure to recruit Black candidates on the basis of their race" and "[f]ailure to hire Black candidate on the basis of their race."[5] *Id.* Neither the Charge nor the EEOC in GPC's numerous attempts to confer make any effort to explain precisely what GPC is accused of doing (or not doing), or what the EEOC is actually investigating. Moreover, the Notice of Charge issued

---

[5] To the extent the Charge suggests GPC should affirmatively recruit and hire candidates based on race, this plainly offends the principles of Title VII. On February 26, 2026, EEOC Chair Andrea Lucas sent a letter to Fortune 500 companies warning them that DEI initiatives violate Title VII. *See* EEOC Chair Issues Reminder Letter to Fortune 500 Regarding Title VII Compliance Related to DEI Initiatives, *available at* https://www.eeoc.gov/ newsroom/eeoc-chair-issues-reminder-letter-fortune-500-regarding-title-vii-compliance-related-dei (last visited 3/8/26).

to GPC on May 28, 2024 provides a conflicting timeline, stating: "The circumstances of the alleged discrimination are based on Race, and involve issues of Hiring that are alleged to have occurred on or about May 28, 2024." *See* ECF No. 1-4.

Despite this lack of clarity, GPC submitted its Position Statement on August 8, 2024. *See* Ex. 2 (Position Statement). GPC explained that there were (then) 6,034 NAPA Auto stores nationwide, of which GPC owned only 32%; the remainder not owned, operated, or managed by GPC in any capacity. *Id.* at 3. Notably, GPC advised EEOC that it was concerned about the vagueness of the Commissioner's Charge, because it lacked "any factual allegations about the actions or practices complained of," despite asserting that an unknown practice caused discrimination within its workforce of more than 27,000 (then) employees in its U.S. Automotive Group. *Id.* at 2. One of the critical purposes of a Charge of Discrimination is to provide adequate notice of the alleged discriminatory conduct or practice to permit the employer to investigate and address the allegations of discrimination. *See Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 878 (5th Cir. 2003) (central purpose of discrimination charge is "to put employers on notice of the 'existence and nature of the charges against them.'") (quoting *EEOC v. Shell Oil. Co.*, 466 U.S. 54, 77 (1984)). Yet, to date, the EEOC has done nothing to clarify which employment practice(s) have allegedly caused discrimination on the basis of race in recruiting or hiring. Nor can GPC on its own discern any such practice, given the individualized local decision-making that results in the careful selection of each GPC employee for a particular role. *See* Section IID, *infra*.

Moreover, GPC raised its concern in its Position Statement about whether the vague nature of the allegations in the May 28, 2024 Commissioner's Charge and the curious alleged "start" date of October 2019 stemmed from a research experiment wherein fake resumes were sent to approximately 100 U.S. companies, including GPC, between 2019 and 2021. The experiment was

publicized in a New York Times article on April 8, 2024, shortly before the Charge.[6] As GPC explained to the EEOC in 2024, an experiment involving fictitious individuals with fictitious education, experience, and qualifications cannot form the basis of a real world EEOC investigation, nor does it demonstrate actual discrimination for EEOC to investigate and potentially remedy, with no actual, alleged victims to compensate. Moreover, GPC argued that the research study is flawed in numerous respects in methodology and conclusions. In addition, because approximately two-thirds of GPC's locations are not Company-owned, neither GPC *nor the EEOC* would have any way of knowing whether fake resumes were sent to Company-owned locations. The EEOC has never responded to the Company's concerns.

Despite the vagueness of the Charge, GPC responded to the best of its ability, including the fact that a comparison of EEOC's own data on the applicable labor pool and GPC's employee demographics directly undermine the Commissioner's allegations: GPC's 2023 consolidated EEO-1 report for its assigned NAICS code (441 – Motor Vehicle and Parts Dealers) revealed that its workforce was comprised of 11.7% Black or African American workers, whereas employers in the same industry employed only 9.9% Black or African American workers. *Id.* at 8, 22.

### B. *The Requests for Information and GPC's Responses*

On April 3, 2025, the Commission issued its first Request for Information ("RFI"), seeking to speak with a corporate representative to discuss six amorphous topics related to GPC's nationwide hiring process for store-related positions since October 2019. *See* ECF No. 1-5 at 2.[7]

---

[6] "What Researchers Discovered When They Sent 80,000 Fake Résumés to U.S. Jobs," available at https://www.nytimes.com/2024/04/08/upshot/employment-discrimination-fake-resumes.html (last visited 3/16/26). To the extent the Commissioner's Charge is based on this blind study, it is necessary for the Court to scrutinize the Subpoena at issue in this case. This is particularly true when an official — speaking on behalf of the EEOC — confirmed that the data obtained from such studies cannot be the basis for a charge. *Id.* (citing Brandalyn Bickner, "a spokeswoman for the [EEOC]" as stating that the EEOC "has seen the data and spoken with the researchers, though it could not use an academic study as the basis for an investigation").

[7] The witness was expected to speak on: (1) GPC's recruitment practices, including third-party job postings; (2) *GPC's*

Additionally, the RFI contained 18 document requests covering a six-year period, requesting: (1) each business location and information about each; (2) all recruitment firms used by GPC and information about each; (3) all job positions at each store nationwide and information about each; (4) job descriptions for every job position at every store nationwide; (5) an explanation of how *employees* are notified of *job vacancies or promotional opportunities* for each store nationwide; (6) documents describing how GPC advertises and recruits for open positions; (7) an explanation of the hiring process for each position and location nationwide, and an additional seven related documentation requests; (8) an explanation of when a person is considered a job applicant and how an applicant is dispositioned; (9) documents relating to GPC's *promotion procedures*, guidance, instructions, handbooks, etc., including any informal documents; (10) documents relating to GPC's hiring procedures, guidance, instructions, handbooks, etc., including any informal documents; (11) an explanation of GPC's retention policies; (12) an explanation of GPC's legal status; (13) an organizational chart; (14) identification of GPC's custodian of records; (15) an explanation of the relationship between GPC and NAPA Auto Parts, with supporting documentation; (16) policies relating to race discrimination, equal employment opportunity in hiring and *promotions*, and internal complaint procedures; (17) all training, guidance, or instructions provided to managers and employees concerning hiring and recruitment, including five separate categories of additional documentation; and (18) the *pay rate* for each in-store management and non-management position at every location nationwide, *including benefits* and additional categories of information. *Id.* at 3-6.

Seven days later and before any response was due from GPC on the first RFI, the EEOC

---

*internal promotions/demotions/transfer practices*; (3) how GPC collects/maintains recruitment sources; (4) minimum qualifications for any position nationwide; (5) job requirements of every position nationwide; and (6) avenues by which GPC accepts applications. These topics are so broad they would not pass muster for a Rule 30(b)(6) deposition.

issued a second RFI with three different sections addressing broad document and data requests. The first section sought information about GPC's Applicant Tracking System (such systems are generically referred to as an "ATS"), Human Resources Information System (again, generically referred to as an "HRIS system"), and other software used in the applicant process for all GPC locations nationwide from October 1, 2019, to the present. *See* ECF No. 1-6 at 2. That section also sought numerous data points for each tracking system, such as the date(s) the system(s) were used, the number of records in each database, the number of applicants and employees in each database, an explanation of any applicants or employees excluded from the respective databases, the name and explanation of each data field within each database, and more. *Id.* at 3.

The second section requested unredacted personnel files for one successful and one unsuccessful applicant for a non-managerial position at any of the thousands of GPC-owned stores, and unredacted personnel files for one successful and one unsuccessful applicant for a managerial position at any of the thousands of GPC-owned stores. *Id.* at 4. Section three requested information concerning GPC's use of algorithms, artificial intelligence, and machine learning for recruitment, screening, selection, and promotion, plus a host of associated data. *Id.* at 4-5.

On May 23, 2025, GPC responded to the RFIs, expressly advising the EEOC that its ability to respond to them was severely "hampered by the lack of information about what the Commission is investigating." *See* Ex. 3 (RFI Response) at 1-2. GPC limited the scope of its responses to the RFIs to August 2, 2023 to the date of the response: 300 days before the date of the Commissioner's Charge. GPC applied this reasonable limitation because the decision to hire (or not hire) an applicant is a discrete act, and any Charge of Discrimination associated with such a decision must be filed within 300 days of the alleged failure to hire.[8]

---

[8] Moreover, the EEOC's own regulations recognize that employers are not expected to maintain documents in perpetuity. Indeed, the EEOC expressly states that "[a]ny personnel or employment record made or kept by an

Further, because GPC had not been given notice in the Commissioner's Charge of any allegations of racial discrimination in its *promotional process or pay practices*, it objected to requests for promotional and compensation information as outside the scope of the Charge. *Id.* at 5-6, 10, 12. Critically, GPC expressly advised the EEOC that its hiring process was entirely decentralized until the second quarter of 2024 (at which time some basic recruiting functions were centralized), meaning that the individual hiring managers across thousands of stores "were responsible for owning ***all aspects of the talent acquisition process.*** *Id.* at 9 (emphasis added). Further, GPC advised the EEOC that after the second quarter in 2024, its recruiters were involved only insofor as overseeing "the sourcing, screening, and recommendation of candidates who meet the job requirements" – not in making hiring decisions. *Id.* In other words, responding to the RFIs would require GPC to scour thousands of locations to locate potentially responsive documents and information, including documents supporting the hiring decisions of thousands of individual managers reviewing tens of thousands of applicants.

In the spirit of compliance, and despite no factual understanding of the practices claimed to be discriminatory or reasons for those allegations, GPC provided the following information, data, and/or documents[9] responsive to the first RFI from August 2, 2023, to present: (1) its recruitment firm contract with Handler Executive Search, used occasionally for placing high-level professionals, (2) an explanation that GPC had used Randstadt Sourceright for some contingency workers (who are outside of Title VII's purview) but did not have documentation of the contract; (3) a detailed description of how GPC advertises and recruits qualified candidates; (4) a copy of

---

employer (including but not necessarily limited to requests for reasonable accommodation, ***application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer***, lay-off or termination, ***rates of pay or other terms of compensation***, and selection for training or apprenticeship) ***shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later***." *See* 29 C.F.R. § 1602.14 (emphasis added).

[9] GPC does not attach documents submitted to the EEOC's RFIs due to the confidential nature of the documents.

its employee referral program; (4) a detailed description of the hiring process, including factors used during the screening process and a clear explanation that interviews and hiring decisions are conducted at the individual store level; (5) a copy of a Workday job application; (6) an explanation that once an individual submits an application in Workday, they are considered an applicant, and the disposition process for an application; (7) a copy of GPC's Code of Conduct (relevant portions of which had already been shared in the Company's Position Statement); (8) an explanation regarding retention of application materials; (9) a description of the Company's corporate/legal status; (10) an explanation that the Company does not maintain an organizational chart; (11) a description of the corporate structure in that GPC is the parent company of NAPA Auto Parts (as explained elsewhere to the EEOC, GPC owns only a minority of NAPA retail stores); and (12) an explanation that GPC use job aids to assist in using Workday. *See* Ex. 3 at 4-12.[10]

As to the second RFI, GPC provided the following information, data, and/or documents: (1) that GPC began using Workday June 1, 2023,[11] which contained data regarding 380,000 U.S. applications and more than 18,000 employees, (2) a request for further clarification regarding the information sought in subparts (c), (f), and (g) of Request No.1 in Section I of the RFI to enable a further response; (3) personnel files for a successful and an unsuccessful candidate for non-managerial positions since August 2, 2023; (4) personnel files for a successful and an unsuccessful candidate for managerial positions since August 2, 2023; and (5) an explanation that GPC "does not use any algorithms, AI, or other automated technology that rates, ranks, or assesses/tests individuals in any of the Company's recruitment, screening, and selection processes." *Id.* at 13-

---

[10] GPC informed the EEOC that it was working to identify information and/or documentation responsive to Requests Nos. 1, 3-4. GPC did not provide information relating to Request Nos. 9 and 18, because the Commissioner's Charge does not allege discrimination in GPC's promotion process for employees or its compensation practices.

[11] Workday's "go live" date as the Company's official HRIS and ATS system, following a ramp up period, was July 1, 2023. Santana Decl. ¶ 10.

17. With respect to its response to both RFIs, the Company noted: "The Company has made a good faith effort to understand the scope and focus of the Charge, and to respond accordingly and thoroughly in both its Position Statement and its responses to the agency's RFIs. We invite further dialogue if you find that our response does not meet this goal." *Id*. at 2.

On June 5, 2025, the EEOC sent a letter regarding GPC's RFI response. *See* Ex. 4 (EEOC Deficiency Letter). The EEOC maintained that its six year scope was appropriate because they interpret the Charge to allege "a continuing violation dating from October 2019." *Id*. Notably, the Charge does not use the term "continuing violation," and the Notice of Charge identifies a specific date of the alleged violation: May 28, 2024. *See* ECF No. 1-4. The EEOC stated that it defined the scope of the investigation as "Respondent's nationwide hiring process for all store-related management and non-management positions since October 1, 2019." *Id.* at 2. <u>Nothing in that communication expanded the scope of the investigation to include the Company's promotion or compensation practices, the Company's employees, or grounds other than race</u>.

GPC timely supplemented its RFI responses on June 26, 2025, as requested by the EEOC. *See* Ex. 5 (Supplemental RFI Response). The response reiterated the Company's concerns regarding the vague nature of the Commissioner's Charge and objected "to the EEOC's apparent position that individual hiring decisions, made at the individual store level, over two thousand individual Company-owned retail stores nationwide, since 2019, can constitute a single continuing violation by the Company." *Id.* at 2. Still, in the spirit of cooperation, GPC supplemented many of its responses to the first RFI, including: (1) providing the business location data requested for Request 1 (*id.* at 4); (2) clarifying that information previously submitted to Nos. 2 and 5 dating back to August 2023 was also fully responsive for the time period since October 1, 2019 (*id.* at 5, 7, ); (3) providing the job positions data responsive to No. 3 from October 1, 2019 to date, from

both "Workday (2023 to present) and its predecessor HRIS PeopleSoft (prior to 2023)" (*id.*); (4) providing the job descriptions requested in No. 4 (*id.* at 6); (5) supplementing its response to No. 6 regarding advertising, recruiting, and referrals to include information from October 1, 2019 to the present (*id.* at 8); (6) supplementing its response to No. 7 providing a detailed description of the hiring process to include information from October 1, 2019 to the present (*id.* at 10); (7) supplementing its response to No. 8 as to how the Company defines an applicant, to include information from October 1, 2019 to the present (*id.* at 11); (8) providing earlier versions of the materials previously produced in response to No. 16 to include information from October 1, 2019 to the present (*id.* at 13). In addition, GPC supplemented many of its initial responses to the second RFI, including: (1) providing information about the applicant data fields available in Workday in response to Section 1 (*id.* at 16); (2) providing an extraction of the hiring codes available in Workday in response to Section 1 (*id.*); (3) supplementing its written description of the Company's HRIS and ATS data systems during the time period of October 1, 2019 to the present in response to Section 1 (*id.*); and (4) confirming that its prior responses with respect to the use of algorithms, AI, and machine learning in response to Section 3 was responsive as to the entire time period back to October 1, 2019 (*id.* at 18-20). In sum, GPC endeavored to answer each of the RFIs submitted by the EEOC by thoroughly supplementing its answers and providing additional documents as outlined in the June 26, 2025 correspondence, subject to proper objections to scope.

### C.  *The Subpoena and GPC's Response and Attempts to Resolve Disputes.*

On July 30, 2025, EEOC issued the administrative Subpoena – the subject of the current application. *See* ECF Nos. 1-1 at 7; 1-7 at 1-14. Attachment A called for production of 30 categories of documents, data, and information, including subparts. ECF No. 1-7 at 4-5. Attachment B called for production of more than 200 data fields from several hundred thousand

*employees* and applicants from three systems: (1) 137 fields from Workday for each nationwide applicant since October 1, 2019 *and all employees since that date*, *id.* at 7-10; (2) 42 fields from Jobvite for each nationwide applicant since October 1, 2019, *id.* at 11-12; and (3) 25 fields from PeopleSoft—an HRIS system that contains only *employee* data and not applicant data—for every Company *employee* since October 1, 2019. *Id.* at 11-12. Notably, **at least five Subpoena requests are broader than the original RFIs (**Subpoena Requests 1, 2, 4, 5, and 7), **and seven are entirely new requests** not previously sought via RFI (Subpoena Requests 3, 8, 9, A, B, C, and D). **For four of the five Subpoena requests that broadened what the EEOC originally sought via RFI, <u>the Company had already complied with the related RFI</u>.** *See* Responses, Objections, and Requests for Modification, ECF 1-9 at 32-45, regarding Subpoena Requests 1, 2, 4, 5.

GPC timely submitted a Petition to Revoke or Modify the Subpoena on August 7, 2025, urging the EEOC to revoke the Subpoena due to its overbreadth, undue burden, and that it exceeded the scope of the allegations of race discrimination in recruitment and hiring in the Commissioner's Charge. *See* ECF No. 1-9 at 1-15. On September 30, 2025—the day before the extended government shutdown—the EEOC denied GPC's petition. *See* Ex. 6 (Determination).

While GPC's petition was pending, the EEOC nevertheless issued a third RFI on August 20, 2025, seeking to interview: 1) a former GPC HR professional who had not worked for GPC since 2023, 2) a Talent Acquisition Specialist, and 3) a People Partner, to speak on six separate topics regarding GPC's recruitment and hiring policies, practices, and procedures since October 2019.[12] *See* Exhibit 7 (RFI 3). On December 9 and 10, 2025, GPC presented People Director,

---

[12] The corporate representative was expected to speak on: (1) GPC's recruitment practices/plans, including the use of third-party job postings; (2) *GPC's internal promotions, demotions, and transfer practices*; (3) how GPC collects/maintains recruitment sources (including more granular subsets of this broad topic) and how individuals learn about job positions at stores (i.e., *employee promotions*); (4) the minimal job qualifications for any position nationwide; (5) the job requirements of every position nationwide; and (6) various avenues by which GPC accepts applications. Notably, these topics are so broad that they would not pass muster for a Rule 30(b)(6) deposition.

NAPA Midsouth Region Kristine Reid and Director of Talent Acquisition Kisha Jones for interview by the EEOC.[13] Reid, among other things, explained the difference between distribution centers and retail stores.[14] Reid highlighted that recruiting and hiring practices vary by location, placing the EEOC on further notice of the lack of a *pattern and practice*, and explained—consistent with GPC's prior responses—that **hiring decisions are made at the local level by individual store personnel**. Jones reiterated that GPC's more centralized recruiting assistance of overseeing the sourcing, screening, and recommendation of candidates who meet minimum job requirements did not ***begin*** until 2024 – long after the EEOC asserts a continuing violation of discrimination began in 2019. *See also* Ex. 8 (Declaration of Kristine Reid ("Reid Decl.")) ¶ 12.

### D. *GPC's Localized, Autonomous Hiring Process*

Distribution centers (Company warehouses) and retail stores have different hiring needs and employee roles. Reid Decl. ¶¶ 4-6. There is no centralized hiring process; each location "make[s] all of their hiring decisions at the local level." *Id.* ¶¶ 7-10. "Final hiring authority for in-store roles rests with Store Leadership, which may include Store Managers, Assistant Store Managers, or District Managers." *Id.* ¶ 7. In other words, thousands of decisionmakers are involved in the hiring decisions that have been made regarding tens of thousands of store-level hires since 2019. These decisions are based upon the criteria that the <u>hiring manager</u> determines for the specific location and role, driven by the location's particular service and product focus, the geographic area, and strengths and weaknesses of the existing personnel at the location. *Id.* ¶ 10.

Candidate interviews, including the means (i.e., in person, by telephone, etc.), are entirely

---

[13] Interviews were scheduled for October 2025; the EEOC did not appear, presumably due to the government shutdown. GPC's counsel and the witnesses joined the videoconference at the appointed times in October, and then worked cooperatively with the EEOC to reschedule when normal government operations resumed.

[14] EEOC complains that GPC did not explain the difference between a distribution center and a heavy-duty store. *See* ECF No. 1-1 at 6 n.1. However, the EEOC *interviewed two corporate representatives they could have asked.*

controlled by the local hiring manager. *Id.* ¶ 9. Moreover, each individualized hiring manager has the capability to forego an interview if they are already familiar with a candidate or their work experience. *Id.* After 2024, Talent Acquisition Specialists, Talent Acquisition Managers, Talent Acquisition Coordinators, Store Managers, Assistant Store Managers, and/or District Managers could be involved in screening or interviewing candidates for retail store and sales positions, depending on local practices. *Id.* ¶ 8-9.[15] Before 2024, "local hiring managers owned and managed all aspects of the local hiring process," with centralized recruiting limited to only high-level functions such as "developing email recruiting campaigns and coordinating participation in job fairs," but the critical hiring decisions were always conducted at the local store level. *Id.* ¶¶ 8, 14.

Autonomous local managers making hiring decisions "based on what that hiring manager believes is the best fit [for] that location or area of business" (*id.* ¶ 10) is antithetical to the EEOC's assertion of a systemic discriminatory recruiting or hiring practice (which the EEOC has yet to identify) driving hiring decisions across thousands of individual locations with thousands of decisionmakers reviewing hundreds of thousands of applications. There is no mandated hiring process nor single source of candidates. Each location "has the autonomy to source candidates from different hiring sources, including but not limited to third-party job websites…, online postings…, local advertising, job fairs, and colleges or vocational schools." *Id.* ¶ 11. Managers may accept walk-in applicants, or directly contact prospects. *Id.* The only constants in GPC's hiring process are: (1) applicants apply through Workday; and (2) open positions are "posted on https://jobs.genpt.com." *Id.*[16] Hiring decisions are plainly discrete acts carried out on a local level.

---

[15] Since 2024, initial screening tasks and scheduling of interviews are done by talent acquisition personnel, whose responsibility is only to ensure that a candidate meets minimum qualifications for the job. *Ex. 8 (Reid Decl. ¶ 9).*

[16] Until June 2023, the Company used PeopleSoft as its HRIS and Jobvite as ATS. On July 1, 2023, the Company officially migrated to Workday for both HRIS and ATS functions. Ex. 1 (Santana Decl. ¶¶ 7-8, 10).

#### E.  *Burden Associated with Complying with the Subpoena Data Requests*

There are at least 2, 276 GPC-owned retail stores and distribution centers. *See* Ex. 1 (Santana Decl. ¶ 5). This means that there are at least 2,276 different decision-makers (more, depending on who the location involves in their hiring process, and accounting for management turn-over during the last six and a half years) whose hiring decisions are at issue under the Charge. Moreover, from October 2019 until June 2023, GPC processed more than 365,000 applications for GPC-owned stores and distribution centers in Jobvite, relating to roughly 47,400 separate job postings. *Id.* ¶ 9. Since July 2023, GPC has processed more than 631,000 applications for more than 33,000 separate job postings for company-owned retail stores and distribution centers in Workday. *Id.* ¶ 11.

Because the EEOC seeks 137 data fields from Workday for more than 631,000 applications and 42,666 employees (*id.* ¶11), the Subpoena seeks more than 92 million data points from Workday alone. In seeking 42 data fields from Jobvite for more than 365,000 applications, the Subpoena requests more than 15 million data points from an inactive system that was retired in June 2023, and exists only in archived form, from which mass reports cannot be run. *Id.* ¶ 8. While the EEOC asserts that GPC has custody or control over Jobvite, the data is not reasonably accessible due to undue burden or cost. The data, all of which relates to recruiting and hiring before the earliest possible limitations period for the May 2024 Charge, must be manually extracted by a GPC employee from the data that was archived from the system. *Id*. ¶¶ 8, 17. GPC used PeopleSoft as its HRIS until June 2023, and that retired system contains over 60,000 unique records for *employees* of GPC-owned retail stores, but no information about applicants. *Id.* ¶ 7. Therefore, all 25 PeopleSoft data fields sought by the Subpoena are unrelated to rejected applicants, provide no information about the pool from which applicants *were* selected, and shed no light on the thousands

of individual hiring decisions that the EEOC contends constitute a continuing violation.

With respect to EEOC's expansive requests for data, GPC has associated the time required to simply compile and extract the data, even before any required efforts to reconcile or conduct a quality check of such data. For instance, of the 137 data fields requested from Workday, at least 14 will require more than 30 days to compile and extract from the system. *Id.* ¶ 14. Another 24 Workday data fields will require at least 14 days to compile and extract the data from the system. *Id.* ¶ 16.  With respect to the 42 data fields from Jobvite, this effort will require GPC to manually extract the data, which will take at least 14 days to compile and extract. *Id.* ¶ 17. Significantly, as GPC has asserted throughout its objections to these data requests, many of the data fields that the EEOC seeks are plainly outside the scope of the Charge's allegations of race discrimination against applicants in recruiting and hiring, and constitute an impermissible "fishing expedition."  These include fields related to the *age, sex, and national origin* of applicants or *employees*, contact information (including personal email addresses and phone numbers) of applicants and *employees*, *compensation and benefits* information for *employees*, *promotion and job history data for employees*, and *termination* information for *employees*.

### III.    ARGUMENT: EEOC's Application for Subpoena Enforcement Should be Denied or Modified to be Consistent with the Commissioner's Charge.

"[T]he EEOC's investigative authority is tied to charges filed with the Commission; unlike other federal agencies that possess plenary authority to demand to see records relevant to matters within their jurisdiction." *Shell Oil*, 466 U.S. at 64. This means that the agency is "entitled to access only to evidence relevant to the charge under investigation." *Id.* While relevance in EEOC investigations is not synonymous with Rule 26 of the Federal Rules of Civil Procedure, the term is construed in such a way "to prevent the Commission from exercising unconstrained investigative authority." *Id.* at 65. Said differently, "the relevance requirement 'is designed to cabin the EEOC's

authority and prevent fishing expeditions.'" *EEOC v. Kronos Inc.*, 620 F.3d 287, 297 (3d Cir. 2010) (quoting *EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 653 (7th Cir. 2002)); *see also EEOC v. K-Mart Corp.*, 694 F.2d 1055, 1066 (6th Cir. 1982); *United Air Lines, Inc.*, 287 F.3d at 653 ("the charge and relevance requirements should not be interpreted so broadly as to render the statutory language a 'nullity'").

The EEOC spends considerable time discussing the broad scope of its authority to request information and documentation, *see* ECF No. 1-1 at 10-16, but ignores the principle that while it "must be allowed to do its job, [] there are limits to its powers too." *E.E.O.C v. Maritime Autowash, Inc.*, 820 F. 3d 662, 668 (4th Cir. 2016). "[A]lthough the legitimate scope of the subpoena power includes information that **might throw light upon** the inquiry raised by the complaint, ***the might*** is an indication of a ***realistic expectation*** rather than an idle hope that something may be discovered." *United Air Lines,* 287 F.3d at 653 (emphasis added; internal quotations and citations omitted). There simply is no realistic expectation that many of the categories of information sought—including the *pay and benefits of current employees*; the *age*, *sex*, and *national origin* of employees and applicants; the *promotion* history of *employees*; and *termination* decisions for *former employees*—shed any light on whether GPC failed to recruit or hire Black candidates on the basis of their race. Investigatory authority does not convey subpoena powers over "any workplace grievance only speculatively related to an agency's statutory authority." *Id.* It is the EEOC's burden to establish relevance. *EEOC v. S. Farm Bureau Cas. Ins. Co.*, 271 F.3d 209, 210 (5th Cir. 2001). "[W]hen a court is asked to enforce an administrative subpoena" the "court then has a duty to prevent any abuse of that process, and does so by a thorough investigation. For example, it should pose the question: has the subpoena been issued for an improper purpose?" *Sunshine Gas Co. v. U.S. Dep't of Energy*, 524 F. Supp. 834, 837 (N.D. Tex. 1981). The "[c]ourt

does not sit as a mere rubber stamp, authorizing unwarranted and unjustified random investigations of companies suspected of violations." *Id.*

### A. The temporal scope of the subpoena is excessive and should be limited.

The Subpoena is also overbroad because it seeks information far exceeding the temporal scope of the Charge. The Notice of Charge states that alleged discrimination "occurred on or about 05/28/2024." Information sought via subpoena dating back to October 1, 2019 is not relevant to alleged discrimination occurring on or about May 28, 2024 – four and a half years later. Under 42 U.S.C. 2000e-5 ("Section 706"), charges must be filed within 180 days of the alleged unlawful employment practice, or 300 days if a state or local agency enforces a law prohibiting discrimination on the same basis. Here, the EEOC is time-barred from challenging any employment decisions prior to August 2, 2023. Yet the EEOC's Subpoena seeks almost four additional years' worth of documents, data, and information. Courts in the Fifth Circuit have confirmed that the limitations period applies to pattern or practice suits brought by the EEOC. *See EEOC v. Bass Pro Outdoor World, LLC*, 884 F. Supp. 2d 499, 523-24 (S.D. Tex. 2012) ("As the 300-day period applies to all of the EEOC's claims, any claims for discrete violations occurring outside of that period—including a pattern or practice of failure to hire—must be dismissed.").

The EEOC's argument that the continuing violation doctrine creates an exception to the statute of limitations is unavailing because the doctrine does not apply to "discrete acts of discrimination." *Id*. at 523-24. As set forth above, each decision to select a particular applicant for hire is a discrete act taken by a specific local manager hiring for a specific role in a specific location, and is not dictated by any corporate or centralized decisionmakers, policies or practices. *See also, e.g.*, Commission Opinion Letter: Section 707 (Sept. 3, 2020), available at https://www.eeoc.gov/laws/guidance/commission-opinion-letter-section-707 ("any claim the

Commission pursues under section 707 must follow the procedures of section 706"). As such, Subpoena should be revoked, or modified to limited the scope to recruiting and hiring Black candidates in Company-owned locations since August 2, 2023.

Subject to the Court enforcing this temporal limitation, GPC would withdraw objections and respond to the following in Attachment A, as to documents or data reasonably accessible:[17]

- *Request No. 1: Provide a list of each business location Respondent operated nationwide between October 1, 2019 and the present. This list should include, but is not limited to, company-owned retail stores and distribution centers.*

GPC already complied with this Request in June 2025 for Company-owned retail stores, and would supplement with a list of distribution centers from August 2, 2023 to present.

- *Request No. 2: Identify all job positions by job title at Respondent's locations, including but not limited to retail stores and distribution centers nationwide during the relevant time period.*

GPC already complied with this Request in June 2025 for Company-owned retail stores, and would supplement with regarding distribution centers from August 2, 2023 to present.

- *Request No. 3: Provide copies of all job aids to assist employees with using the Workday system distributed by Respondent to employees or agents that relate to hiring and/or application management between October 1, 2019, and the present.*

GPC would provide this requested information from August 2, 2023 to present.

- *Request. No. 4: Provide a copy of Respondent's recruiting contract(s) with Randstad SourceRight from October 1, 2019 to the present. For each, identify:*
     *a. Name, position title, and contact information of Respondent's Employee responsible for communicating with Randstad SourceRight;*
     *b. Name, position title, and contact information of Respondent's point of contact with Randstad SourceRight;*
     *c. Beginning date(s) of contract;*
     *d. End date(s) of contract;*
     *e. Positions outsourced for recruitment referral;*
     *f. Telephone number(s) for Randstad SourceRight;*
     *g. E-mail address for Randstad SourceRight.*

---

[17] There is no responsive information Request No. 9.

GPC has communicated to the EEOC repeatedly that following a diligent search, the contract is no longer reasonably accessible and cannot be provided; GPC would respond to the subparts of this request with available responsive information from August 2, 2023 to present.

- *Request No. 5: Provide an unredacted copy of Respondent's recruitment contract(s) with Handler Executive Search from October 1, 2019 to the present.*

Even though GPC already provided a redacted copy of this contract in June 2025 and even though this contract has no bearing on the case because – as GPC has explained in writing to the EEOC – Handler has been used only for recruiting for corporate positions <u>which the EEOC has never identified as being included in the scope of the Charge, the RFIs, or this Subpoena</u>, GPC, in the spirit of good faith would comply with this request from August 2, 2023 to present.

- *Request No. 6: For the period of October 1, 2019 to the present, provide copies of documents which outline Respondent's hiring policies and procedures, protocols, guidance, instructions, handbooks, training materials or other documents that describe Respondent's application, hiring, interview, or hiring or selection policies or procedures. If informal procedures are used for hiring, please provide documents that describe any policies or procedures that guide or regulate how those positions are filled.*

GPC already complied with the majority of this Request via prior responses, including: (1) extensive narrative descriptions of its application, hiring, interview, and selection policies and procedures in response to RFI Nos. 6, 7, 8, 10, and 16 in May and June 2025; (2) the production on August 4, 2024 of relevant excerpts of the Code of Conduct and a copy of the Human Rights Policy as exhibits to the Company's Position Statement; (3) the production on June 26, 2025 of the Referral Program Policy, additional responsive excerpts from the 2023 Code of Conduct, and responsive sections of the 2023, 2024, and 2024 Employee Handbook and 2025 Code of Conduct; and (4) the production in December 2026 of Ms. Reid and Ms. Jones for interviews by the EEOC's investigators on a wide range of recruiting and hiring topics.  However, GPC would supplement with any additional reasonably available documents from August 2, 2023 to present.

- *Request No. 9: Provide all studies or other analyses conducted by any person related to the racial or national origin composition of Respondent's applicants, hires, or employees, including but not limited to any analysis of whether Respondent has shortfalls or underutilization of applicants or employees based on race or national origin or any analysis of differences in selection or hiring rates based on race or national origin.*

GPC maintains its objections that the scope of this Request is overbroad insofar as it seeks information related to employees, and as to national origin. However, GPC has confirmed that there are no non-privileged, responsive documents, rendering those objections moot.

### B. Pay data is irrelevant to the allegations of the Charge, and thus the investigation.

The plain fact is that <u>the Charge alleges no discrimination with respect to pay or benefits,</u> or any other terms and conditions of *employees'* employment.  The pay and benefits provided to the applicants who *were selected for employment* (and therefore – axiomatically were *not* subjected to "failure to recruit" or "failure to hire," as alleged in the Charge) is simply not relevant.

First, the EEOC exposes the improper purpose for which it seeks pay and benefit data (i.e., fishing for information outside of the scope of the Charge) by arguing that the "collection of pay rate and benefit information allows EEOC to evaluate relevant context, i.e., whether Black applicants, when they are hired, are placed into inferior employment, i.e., lower-paying jobs with fewer benefits." *See* ECF No. 1-1 at 19. Such information sheds no light on the specific acts alleged to be discriminatorily conducted per the Charge: failure to recruit and/or failure to hire Black candidates. Where the EEOC <u>admits</u> that the purpose of the subpoenaed data is to instead review how Black *employees* are treated with respect to *pay and benefits*, the request plainly exceeds its authority to investigate the alleged violation before it.

Second, while the EEOC concedes that it <u>is</u> required to demonstrate "relevancy" of the information it seeks (*see* ECF No. 1-1at 16), it asserts only that pay and benefit data are necessary because, at some future unknown time, *if and only if* the EEOC finds a violation, the Commission

-21-

may "engage in the conciliation process, during which it attempts to remedy the violation by pre-suit agreement to resolve the case." *See* ECF No. 1-1 at 18. This argument places the cart before the horse. We are at the investigative stage, and no cause has been found. Even if the EEOC were to issue a reasonable cause finding, which GPC contends would not be possible based on the plain lack of any policy or practice of failing to recruit or hire Black candidates, the EEOC cannot know at this time what the scope of any such hypothetical finding would be – geographically, temporally, or the job positions allegedly affected – and therefore cannot know what pay data is "relevant." To insist at this stage on compensation and benefits data from GPC's entire Company-owned retail store and distribution center employee population for more than six years is exactly the sort of fishing expedition the courts have cautioned that the EEOC may not undertake.

One of the cases the EEOC heavily relies upon clearly articulates the multistep process. First, the charge "place[s] the EEOC on notice that someone (either a party claiming to be aggrieved or a Commissioner) believes that an employer has violated." *Shell Oil*, 466 U.S. at 68. Next, the Commission must "undertake[] an investigation into the complainant's allegations of discrimination." *Id.* "Only if the Commission, on the basis of information collected during its investigation, determines that there is 'reasonable cause' to believe that the employer has engaged in an unlawful employment practice, does the matter assume the form of an adversary proceeding." *Id.* Although it has yet to identify any systemic discriminatory practice or define the scope in which it has occurred, the EEOC asks this Court to require GPC to tracking down for over 2,276 locations and a nearly seven year period, the "pay rate and benefits offered, and all guidance/policies used to set salary or wage levels, bonuses or merit increases" with respect to "each management and nonmanagement position." If the EEOC identifies a discriminatory pattern and practice and issues a reasonable cause determination, it can certainly request appropriately scoped pay data at that

time. But at this stage of the investigation, the Court should not permit the request.

### C. Past complaints should be limited to failure to hire or recruit on the basis of race (Black), and a search of reasonably accessible sources.

Here, the EEOC seeks to obtain "all complaints, reports, charges of discrimination, and/or lawsuits (collectively, "complaints") alleging discrimination against applicants or employees on the basis of race, national origin, or color." *See* ECF No. 1-7 at 5. Additionally, the EEOC seeks the identity of each complainant, date of complaint, the allegations raised, a description of the Respondent's response, and all documents related to the complaint. *Id.* This request, unlimited to allegations related to hiring and recruiting and broader that the Charge's focus on race, exceeds any arguable relevance. Without any limits on subject matter, geography, or centralized storage of complaints, the EEOC functionally requests that GPC halt its human resources department by requiring them to canvass thousands of stores to determine whether any employee or applicant has ever raised any complaint of discrimination, orally or in writing, in the last six and a half years.

First, the EEOC attempts to impermissibly expand its inquiry from discrimination with respect to Black applicants – plainly the only discrimination articulated in the Charge – to discrimination on the basis of *any* race, *and* on the basis of *any color or national origin*. But race, color, and national origin are separate and distinct concepts under the law. *See*, *e.g.*, *Kebiro v. Walmart*, 193 F. Appx. 365, 367 (5th Cir. 2006) (per curiam) (holding that a Black employee from Kenya failed to exhaust claims of race discrimination where his EEOC Charge mentioned only national origin). Assertions of discrimination on different grounds are not probative of the Commissioner's allegations of "failure to recruit Black candidates" and "failure to hire Black candidate on the basis of their race."

Moreover, the scope is overbroad in that the EEOC seeks any complaint made in any one of thousands of individual locations against any other employee regardless of whether the alleged

-23-

discrimination related to recruiting or hiring. "In employment discrimination cases, discovery is usually limited to information about employees in the same department or office absent a showing of a more particularized need for, and the likely relevance of, broader information." *Gillum v. ICF Emergency Mgmt. Servs., L.L.C.*, No. CIV.A. 08-314-C-M2, 2009 WL 2136269, at *3, 6 (M.D. La. July 16, 2009). Further, "[c]ourts within the Fifth Circuit Court of Appeals have typically limited such discovery in terms of time, substantive scope, and geographical scope." *Id.* (collecting cases; recognizing: "(1) limitations to the same form of discrimination; (2) limitation to the same department, agency, facility, or state where the plaintiff worked; and (3) a reasonable time limitation before and after the discrimination complained of.").

Finally, the burden of coordinating thousands of individual inquiries to individual locations, asking them to search for complaints over more than six years (let alone then collecting a detailed narrative description and all of the related documents about any such complaints that have occurred) would simply grind the Company's HR functions to a halt. A subpoena request is unduly burdensome when it "hinder[s] normal business operations or unduly disrupt[s the employer's] business." *EEOC v. BASF Corp.*, 2003 WL 21219038, *4 (E.D. Mo. 2003) (citing *United Air Lines,* 287 F.3d at 653; *EEOC v. Citicorp Diner's Club*, 985 F.2d 1036, 1040 (10th Cir. 1993)). Rather, the scope should be limited to documented complaints of discrimination on the basis of race (Black) in recruiting or hiring since August 2023, which are reasonably accessible in any centralized repository that GPC maintains for receipt of and addressing such complaints.

### D. The data sought in Attachment B is overly broad and unduly burdensome.

"If the personnel or financial burden on the employer is great compared to the resources the employer has at its disposal, the district court should attempt to alleviate this burden." *United Air Lines*, 287 F.3d at 653-54. Courts weigh the burden of compliance against the relevance of the

information requested. *See Ford Motor Credit Co*., 26 F.3d 44, 47 (6th Cir. 1994) ("Essentially, this court's task is to weigh the likely relevance of the requested material to the investigation against the burden to [the employer] of producing the material"); *EEOC v. Packard Electric Div*., 569 F.2d 315, 317-18 (5th Cir. 1978) (describing the analysis as "a balancing of hardships and benefits"). Courts will not enforce requests where compliance is burdensome and the information has only an "extremely tenuous" connection to the underlying charge. *Ford,* 26 F.3d at 47.

Here, the EEOC's requests are unduly burdensome because they apply nationwide, over almost seven years, requiring the Company to search for and produce voluminous information and data with limited – and in some cases, no – relevance. As set forth above, from October 2019 until September 2025, GPC processed just shy of 1 million applications for more than 80,000 positions in retail stores and distribution centers. *Santana Decl.* ¶ 9-11. In requesting 137 data fields from Workday and 42 data fields from Jobvite, the EEOC seeks more than 1 billion data points. These data requests impose a significant burden in terms of time and resources on the Company, given the incredibly high volume of applicant and employee records in its systems, the fact that the requests seek data from multiple applicant tracking and HRIS systems, and the fact that the Company has retired its Jobvite and PeopleSoft systems. The undue burden imposed by these overbroad requests is heightened even further by the fact that may of the requests are not tethered to the allegations of the underlying Charge. Instead, the EEOC seeks to obtain burdensome, unrelated data with respect to age, sex, national origin, compensation, promotions, terminations, and names and personal contact information from both applicants and from *employees* whom GPC could not have "fail[ed] to hire" or "fail[ed] to recruit." Therefore, the Subpoena should be revoked, or modified as previously requested by GPC directly to the agency itself, because compliance would be too onerous, time-consuming, and expensive, causing an undue burden.

Respectfully submitted,

*/s/ Erika L. Leonard*
Erika L. Leonard
Texas State Bar No. 24110740
erika.leonard@ogletree.com
**OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C**
301 Congress Avenue, Suite 1150
Austin, TX 78701
Telephone: (512) 344-4700
Facsimile: (512) 344-4701

Jeremy Hays
Texas State Bar No. 24083156
jeremy.hays@ogletreedeakins.com
**OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.**
8117 Preston Road, Suite 500
Dallas, Texas 75225
Telephone: (214) 987-3800
Facsimile: (214) 987-3927

D'Ontae Sylvertooth *(Pro Hac Vice)*
Maryland State Bar No. 21812
dontae.sylvertooth@ogletree.com
**OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.**
1909 K Street, N.W., Suite 1000
Washington, DC 20006
Telephone: (202) 887-0855
Facsimile: (202) 887-0866

**ATTORNEYS FOR RESPONDENT**

-26-

-27-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of March 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will transmit a Notice of Electronic Filing to the following counsel of record:

**EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION**

RONALD PHILLIPS
Acting Regional Attorney

ANN HENRY
Acting Supervisory Trial Attorney

ALEXA LANG
Senior Trial Attorney
Alexa.lang@eeoc.gov

BROOKE E. LÓPEZ
Senior Trial Attorney

Dallas District Office
217 S. Houston St., 3rd floor
Dallas, Texas 75201
Telephone: 972-918-3648
Facsimile: 214-253-2749
**ATTORNEYS FOR PETITIONER**

/s/ Erika L. Leonard
Erika L. Leonard