# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | § § § | |
| Petitioner, | § § | |
| v. | § § | CIVIL ACTION NO. 3:26-MC-009-N-BW |
| GENUINE PARTS COMPANY d/b/a NAPA Auto Parts, | § § § | |
| Respondent. | § § § | |

## <u>DECLARATION OF NADINE SANTANA</u>

1.    I, Nadine Santana, am over the age of 18 and competent to make this declaration. I am making this declaration pursuant to the provisions of 28 U.S.C. § 1746.

2.    I am currently employed by Genuine Parts Company ("Genuine Parts" or "the Company") as HR Operational Excellence Director.

3.    I understand this matter concerns a subpoena issued by the Equal Employment Opportunity Commission on July 31, 2025 with respect to a Commissioner's Charge issued on May 20, 2024 alleging failure to recruit and hire Black candidates on the basis of their race.

4.    I further understand that the EEOC has defined the scope of the subpoena as covering all applicants and hires at all Company-owned retail stores and distribution centers from October 2019 to the present.

5.    Upon a review of the Company's records, I have located at least 2,276 Company-owned retail stores and distribution centers that have been in operation at any time since October 2019.

6.    Upon a review of the Company's records, since 2019, Genuine Parts has employed a total of at least 56,240 employees in Company-owned retail stores and distribution centers.  The Company currently employs over 20,800 individuals in Company-owned retail stores and distribution centers nationwide.

7.      Until June 2023, the Company used PeopleSoft as its Human Resources Information System ("HRIS"). This retired system contains over 60,000 unique Company-owned store records, but no information regarding applicants.

8.      Until June 2023, the Company used Jobvite as its applicant-tracking system ("ATS"). The system was decommissioned in December 2023. Some data was exported from Jobvite before it was decommissioned and archived. However, that data cannot be searched efficiently and reports cannot be run, given that the Company no longer has access to the Jobvite system. Any data to be extracted from the Jobvite archived files has to be manually reviewed and pulled.

9.      Upon a review of the Company's records, from October 2019 to June 2023, the Company processed more than 365,000 applications for positions in company-owned retail stores and distribution centers in Jobvite. These applications related to approximately 47,400 separate job postings during that time.  The Company cannot identify the number of unique applicants associated with the Jobvite applications without conducting a manual data pull of the archived data.

10.     Beginning July 1, 2023, the Company began using Workday as both its HRIS and ATS systems.

11.     Upon a review of the Company's records, from June 2023 to September 2025, the Company processed more than 631,000 applications for more than 33,000 separate job postings for company-owned retail stores and distribution centers in Workday.  In addition, Workday houses records related to 42,666 employees who have been employed since June 2023.

12.     Upon a review of the Company's records, there were more than 100 unique job codes stored in PeopleSoft and Workday, representing more than 100 unique job titles across the Company-owned retail stores and distribution centers.

13.     Upon a review of the subpoena, there are 137 data fields sought in the EEOC's Subpoena from the Workday system.

14.     Upon a review of the Company's records, the Company has identified that, in its good faith estimation, 14 of the fields requested by the EEOC from the Company's Workday system will require more than 30 days to compile and extract from the Company's system:

> Average Interview Rating
> Cost Center (Compensation)
> Date Completed (REST)
> Disposition Stage
> Integration Identifier
> Last Adjudicated Date
> Last Recruiting Stage Change Moment
> Legal First Name

2

Legal Last Name
Masked Job Application ID
Reference ID
Reference ID (Internal API Use Only)
Reference ID (Internal REST API Use Only)
Reference ID Value

15.     The identified fields above will take an estimated more than 30 days to compile and extract from Workday because, although the back-end data for these fields exist, they are not part of any existing report that can be run.  A report has to be built and developed by an internal team in GPC's HRIS team for the purpose of extracting this data. The report then has to be validated to ensure that it is correctly extracting and compiling the correct information.

16.     The Company has further identified that, in its good faith estimation, another 24 of these fields will require at least 14 days to compile and extract from the Company's Workday system because they require multiple reports to be run to obtain the requested information:

Added By
All Job Requisitions Applied to By Associated Candidate
All Job Requisitions Applied to by Candidate
Background Check Status
Candidate ID
Candidate Withdrawn
CNV-REC-Ethnicity Reference ID
CNV-REC-Job Application Date
CNV-REC-Recruiting Disposition Reference ID
CNV-REC-Recruiting Stage Reference ID
CNV-REC-Status Time Stamp
Date of Birth
Disposition Category
Do Not Hire
Employee ID (Compensation)
First Name
Hire Date (Compensation)
Is Active
isRejectedOrWithdrawn
Job Category
Job Category (Compensation)
Job Classifications (Compensation)
Last Job Application Update Moment
National ID

17.     Upon a review of the subpoena, there are 42 data fields sought in the EEOC's Subpoena from the Jobvite system, all of which will be required to be pulled manually. The Company has identified that, in its good faith estimation, 31 fields

3

will require at least 14 days to compile and extract from the Company's Jobvite system:

Address

ApplicationId

Base Annual Salary

Candidate Type

Candidate_Full_Name-EEO_Post-Offer

Candidate_Full_Name-EEO_Pre-Offer

CandidateId

City

Disposition

Email

Emplid

Ethnicity-EEO_Post-Offer

Ethnicity-EEO_Pre-Offer

FirstName

Form_Submitted_Date-EEO_Post-Offer

Form_Submitted_Date-EEO_Pre-Offer

Form_Submitted_Date-503_Post-Offer

Form_Submitted_Date-503_Pre-Offer

Gender

Gender-EEO_Post-Offer

Gender-EEO_Pre-Offer

HireDate

HomePhone

Hourly Rate

How did you hear about us

LastName

LastUpdate

Mobile

Position Number

PostalCode

Race

Race-EEO_Post-Offer

Race-EEO_Pre-Offer

Rating

RequisitionID

RequisitionTitle

Source

StartDate

4

State
Status
Submitted
WorkPhone

18.    Upon a review of the subpoena, the following 25 data fields are sought in the EEOC's Subpoena from the PeopleSoft system, not all of which were maintained by the Company. In addition, PeopleSoft houses only historical employee data and no data regarding applicants:

Emplid or Employee ID (the unique employee identifier)
Employee Name (first and last name)
Application ID (original Jobvite application identifier)
Hire Date (date employment began)
Action Code (HIR, SUR, etc.)
Action Reason (reason for the action)
Job Code
Posting Title
Manager Level
EEO-1 Category
Department (department code or name)
Location (physical work location name)
Facility Number (physical work location identifier)
Business Unit (business unit assignment)
Employee Address (home address)
Employee City
Employee State
Employee Zip Code
Employee Phone (home or mobile phone)
Employee Email (personal email address)
Race/Ethnicity (self-identified race/ethnicity)
Employee Status (active, terminated, or leave status)
Termination Date (date employment ended)
Termination Reason (reason for separation)
Position History (all positions with dates)

I declare under penalty and perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 16, 2026, in Atlanta, Georgia.

*Nadine Santana*
_____
Nadine Santana

5

# EXHIBIT 2

**Ogletree Deakins**

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
*Attorneys at Law*

301 Congress Avenue, Suite 1150
Austin, TX 78701
Telephone:  512-344-4700
Facsimile:  512-344-4701
www.ogletree.com

Shafeeqa W. Giarratani
(512) 344-4723
shafeeqa.giarratani@ogletree.com

August 8, 2024

**CONFIDENTIAL**

**VIA EEOC PORTAL**
Jonathon Harris
Equal Opportunity Investigator
U.S. Equal Employment Opportunity Commission
Dallas District Office
207 S. Houston St., 3rd Floor
Dallas, TX 75202

> RE:  Commissioner Kalpana Kotagal v. Genuine Parts Company
>       EEOC Charge No. 450-2024-07829

Dear Investigator Harris:

This letter serves as Genuine Parts Company d/b/a NAPA Auto Parts (hereinafter the "Company") Position Statement in response to the above-referenced Charge filed by Commissioner Kalpana Kotagal.[1]  The Company is happy to cooperate with the agency's investigation and is confident that the agency will find that the allegations lack merit and should be dismissed summarily.

As a preliminary matter, the Commissioner's Charge must be dismissed because it fails to cite any specific evidence or factual allegations to support the broad assertion that the Company has discriminated against African-American candidates in recruiting and hiring, and is thus,

---

[1] This response includes confidential information and is not to be disclosed without the written approval of the Company.  It is based on the Company's understanding of the facts and the information reviewed thus far and is submitted for the purpose of aiding EEOC in its investigation and facilitating the informal resolution of this matter.  This response, while believed to be accurate, does not constitute an affidavit or a binding statement of the Company's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with the Commissioner's allegations.  Because additional facts likely would be uncovered through adversarial discovery or following a full investigation, the Company in no way waives its right to present new or additional information at a later date, for substance or clarification.  Moreover, by responding to this Charge, the Company does not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the Charge and the Commissioner's allegations.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Columbus ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond St. Louis ▪ St. Thomas ▪ Sacramento ▪ Salt Lake City ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

August 8, 2024
Page 2

technically deficient as a matter of law. Further, the evidence is clear that the Company does ***not*** discriminate against African-American candidates in recruiting and hiring. To the contrary, the Company is an equal employment opportunity and affirmative action employer, has robust outreach and recruitment programs, and supports a number of Diversity, Equity and Inclusion (DEI) initiatives all specifically designed to recruit, hire, and retain African-American candidates and employees. Indeed, the Company's employee population reflects these efforts; the Company actually has more African-American employees than the applicable labor pool. For these reasons, the allegations in the Commissioner's Charge have no merit, and the Company respectfully requests that the Commissioner's Charge be dismissed.

**I.     THE COMMISSIONER'S CHARGE SHOULD BE DISMISSED BECAUSE IT LACKS SUFFICIENT FACTUAL DETAIL TO MEET REGULATORY REQUIREMENTS.**

First, the Charge must be dismissed because it does not contain sufficient factual detail to meet regulatory requirements. Like all EEOC Charges, a Commissioner's Charge must include "[a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices." 29 C.F.R. § 1601.12(a)(3); *see also* 42 U.S.C. § 2000e-5(b) (notice of a charge should include "the date, place and circumstances of the alleged unlawful employment practice"); EEOC Webpage on Commissioner Charges and Directed Investigations, available at https://www.eeoc.gov/commissioner-charges-and-directed-investigations (explaining that a Commissioner may initiate a charge "by preparing and signing a charge document that complies with the requirements in the EEOC's regulations.").

Here, the Commissioner's Charge is deficient because it fails to provide any factual allegations about the actions or practices complained of, other than to allege "unlawful discriminatory practices" in violation of Title VII, that "include, but are not limited to," "Failure to recruit Black candidates on the basis of their race" and "Failure to hire Black candidates on the basis of their race," "since at least October 2019," "nationwide." The Notice of Charge is equally lacking in facts, only stating that the Commissioner's Charge involves Title VII and that "[t]he circumstances of the alleged discrimination are based on Race, and involve issues of Hiring that are alleged to have occurred on or about 05/28/2024," which is the date of the Notice.

The regulatory obligation to provide a sufficient statement of factual allegations is required so that a Respondent has proper notice of the allegations under investigation and can proffer an adequate response and defense. Here, the Charge makes a sweeping assertion that the Company (which has over 27,000 employees in its U.S. Automotive Group) has discriminated against all African-Americans nationwide in recruiting and hiring for almost five years, without identifying any specific examples of alleged discriminatory conduct to support these recruiting and hiring claims, and without identifying any alleged victims.[2] Thus, this Charge fails wholly to provide

---

[2] To the extent the Commissioner's Charge is based on a research experiment where fake resumes were sent to numerous employers, including the Company, between 2019-2021, it must be dismissed for that reason as well. An experiment cannot form the basis of a real world EEOC investigation, nor does it demonstrate actual discrimination. The research experiment involved fictitious individuals, with fictitious education, experience, and qualifications, so there is no actual, alleged discrimination for EEOC to investigate and potentially remedy, and no actual, alleged

August 8, 2024
Page 3

notice on matters under investigation or an opportunity for the Company to offer an adequate defense. Moreover, speculative, unsupported assertions are insufficient to state a claim of discrimination under Title VII. *See generally, e.g.*, *Warren v. Ga Div. of Fam. Child. Servs. Coweta Cnty.*, No. 3:23-cv-00063-TCB-RGV, 2023 U.S. Dist. Lexis 140708 (N.D. Ga. Aug. 11, 2023) (dismissing Title VII complaint that contained only sparse and conclusory factual allegations of discrimination). Because the Charge fails to provide sufficient facts to demonstrate an alleged unlawful employment practice, it must be dismissed on its face, in compliance with the regulatory requirements. *See* 29 C.F.R. § 1601.12(a)(2)-(4); *see also id*. at § 1601.18(a) (a charge that fails to state a claim under Title VII should be dismissed).

## II.      THE COMPANY IS AN EQUAL OPPORTUNITY EMPLOYER.

Founded in 1928, the Company (through its U.S. Automotive Group and owned NAPA Auto Parts stores) is a service organization engaged in the retail and distribution of automotive replacement parts and supplies. The Company is proud of its long history of equal employment opportunity and, as a federal contractor, is also an affirmative action employer.

It is important to note that there are 6,034 NAPA Auto Parts stores throughout the United States. As of August 1, 2024, the Company owns 1,945 stores, which represents 32% of the total number of NAPA Auto Parts stores. For the remaining 4,081 stores, or 68% of stores, the Company does not own, operate, or manage those businesses, nor does the Company have any input or oversight of their hiring and retention practices.

There is simply no evidence that the Company discriminates against African-Americans in recruiting, hiring, or in any other employment decision. In fact, the Company is committed to promoting equal employment opportunities for all candidates and employees and to providing a workplace free from discrimination, harassment, and retaliation. *See* Exhibit A, the Company Code of Conduct. The Company's Code of Conduct explicitly includes a Diversity, Equity and Inclusion policy that prohibits discrimination based on race and requires all Company employees to "do our part to maintain an environment where everyone has an equal opportunity to succeed." The policy is clear on the Company's commitment to equal employment opportunity and states:

> We recognize the benefits that diversity, inclusion and equal opportunity provide, and we know that our collection of talents, experiences and perspectives helps us better serve the diverse world we live in. Simply stated, diversity is a conscientious effort to create a workforce composed of people with varying backgrounds and characteristics. Equal opportunity is the proactive reinforcement of policies, practices, attitudes and actions that produce the equitable   access, opportunities, treatment and fair outcomes needed for true diversity and inclusion to exist.

---

victims to compensate. In addition, the research study is flawed in numerous respects in its methodology and conclusions. The Company expressly reserves the right to further address any allegations based on this experiment, or any other experiment involving fictitious individuals.

August 8, 2024
Page 4

*Id*.  The Company also has a Human Rights Policy that affirms its commitment to nondiscrimination:

> GPC's commitment to respecting Human Rights begins with an affirmative commitment to nondiscrimination.  In line with this commitment, GPC opposes all forms of discrimination, harassment, and retaliation based on protected status or activity.  Whether an individual is an applicant, employee, customer, partner, affiliate, or guest, GPC will not tolerate any mistreatment based on . . . race . . . or any other protected characteristic or activity under applicable law.

*See* Exhibit B.  The Company distributes these policies to all employees, regularly trains managers and employees on these policies, and makes them available for all on the Company's website (https://www.genpt.com/governance-docs/).

Moreover, the Company demonstrates and publicly posts its commitment to equal employment opportunity in its recruiting efforts.  On the Company's Careers webpage, the Company makes clear that it recruits, hires, trains, promotes, assigns, transfers, and terminates employees without regard to race or any other protected trait, but rather based on ability, achievement, experience, conduct, and other legitimate business reasons.  *See* Exhibit C, https://jobs.genpt.com/ (stating "GPC conducts its business without regard to sex, race, creed, color, religion, marital status, national origin, citizenship status, age, pregnancy, sexual orientation, gender identity or expression, genetic information, disability, military status, status as a veteran, or any other protected characteristic.  GPC's policy is to recruit, hire, train, promote, assign, transfer and terminate employees based on their own ability, achievement, experience and conduct and other legitimate business reasons.").  The Company also includes this EEO statement on all of its job postings to ensure all applicants know of the Company's commitment to equal employment opportunity.  *See, e.g.*, Exhibit D, https://jobs.genpt.com/job/atlanta/product-manager-service-processes/505/67851655344.

### III. THE COMPANY DOES NOT DISCRIMINATE AGAINST AFRICAN-AMERICANS.  TO THE CONTRARY, THE COMPANY TAKES ACTIVE STEPS TO RECRUIT, HIRE, AND RETAIN DIVERSE CANDIDATES, INCLUDING AFRICAN-AMERICAN CANDIDATES.

The Company does not, and has not, discriminated against African-American candidates in recruitment and hiring.  To the contrary, the Company engages in robust outreach and recruitment initiatives to ensure it has a pipeline of qualified, diverse candidates, including African-American candidates.  The Company has specifically invested in a wide variety of efforts directed towards ensuring that it recruits, hires, and retains African-American talent.  These efforts and initiatives have enhanced a more inclusive corporate culture and reflect the Company's ongoing commitment to diversity, equity, and inclusion.

August 8, 2024
Page 5

A.    The Company Invests in Recruiting Partnerships, Internships, and Scholarships to Support Its Efforts to Recruit and Even Create a Future Pipeline of African-American Candidates to Work at the Company

The Company has invested in a number of different programs to support its diversity recruiting efforts, and particularly its efforts to recruit, invest in, support, and hire African-American candidates.  For example:

- **Recruiting Partnerships:** In 2021, the Company formed a strategic partnership with the Atlanta Consortium Schools, which is comprised of four Historically Black Colleges and Universities (HBCUs) in southwest Atlanta, Georgia – Clark Atlanta University, Morehouse College, Morehouse School of Medicine, and Spelman College – to enhance its diverse recruiting efforts of African-Americans. Key initiatives have included a meeting between the Company's leaders and the Atlanta University Center Consortium (AUC) representatives at Morehouse College; AUC leaders engaging with the Company's DEI Council at its headquarters to explore additional recruitment opportunities; the Company talent team participating in on-campus recruiting events at AUC; and establishing a partnership with Metropolitan College in Atlanta, which is a predominantly Black regional college in the Georgia school system to further recruiting of African-Americans.

- **Diversity in Internships:** To ensure inclusivity and create a pipeline of diverse talent, the Company's DEI Council has conducted thorough reviews of recruitment strategies and manager training to promote inclusivity in internships.  These internships provide key training and foster relationships for candidates that participate.  Diverse interns have increased from 15% to more than 50% diverse candidates since 2021, creating a strong pipeline of future diverse employees.

- **Outreach & Recruitment Program for African-American Accountants:** For further outreach to African-Americans in recruiting, the Company has implemented a strong recruitment strategy for Black accountants, including participation in recruitment fairs such as AUC and the National Association of Black Accountants (NABA), as well as targeted school outreach.  NABA is widely regarded as providing the leading forums for Black accounting, finance, and business professionals.  When NABA was founded in 1969, less than 1% of all CPAs in the U.S. were Black.  NABA is dedicated to bridging the opportunity gap for Black business leaders in accounting, finance, business, and entrepreneurship by providing leadership and technical training, as well as networking and career opportunities.[3]

---

[3] In addition to the above programming, the Company has adopted a retention strategy to support its accountant recruiting efforts through its two-year Finance and Accounting Rotational program (FAR).  This program is designed to give graduating college students and recent college graduates opportunities to learn more about the fields of finance

August 8, 2024
Page 6

- **<u>Scholarships to Support Students of Company Employees, Particularly Students at HBCUs</u>:** The Company supports a scholarship program that aims to assist its employees' children and dependents with furthering their education. This scholarship program is designed to help the Company recruit diverse talent, and students attending HBCUs are expressly encouraged to apply. The Company has increased its investment in this scholarship program since its inception. For example, there has been an increase in scholarship amounts, from $1,500 each in 2020, to $2,500 each starting in 2022. In addition, there has been an increase in the number of HBCU recipients; for example, there were two HBCU recipients in 2020, and seven HBCU recipients in 2023 (representing 70% of the 2023 recipients).

The Company also ensures inclusivity in recruiting by encouraging employee referrals and conducting other outreach and recruiting efforts with universities, two- and four-year local colleges, vocational technical schools, high schools, local business schools, and state and community organizations to attract qualified candidates, including qualified African-American candidates. By way of example, in the Atlanta area, the Company has worked with various local diversity recruitment sources, including the Atlanta Urban League – Employment Services and 100 Black Men of North Metro Atlanta Placement Office. The Company also has a presence online on Handshake, as another means of increasing the Company's visibility and diverse talent pipeline.

B.    <u>The Company Invests in Various Efforts to Retain Diverse Talent and Specifically African-American Employees</u>

In addition to specific efforts to recruit and hire African-American employees, the Company has also implemented a robust series of inclusion initiatives to ensure that it retains diverse talent, including African-American employees, once hired. For example:

- **<u>DEI Council</u>:** The Company has a specific group of leaders tasked with ensuring inclusivity in every aspect of the Company. The DEI Council includes senior leaders from across the Company's various business units and other senior level executives, including the Company's Chief Human Resources Officer and Talent Director, along with other Human Resources, Legal, Communications, Finance, and Transformation directors and officers. The DEI Council is tasked with supporting a wide range of Company DEI efforts, programs, and events, including activities with business resource groups (BRGs), such as providing executive sponsors for such groups, and working on strategies to increase diverse representation within the Company.

---

and accounting, including giving them exposure to investor relations, treasury, FP&A, operational finance, internal audit, tax, business process improvement, general accounting, and financial reporting.

August 8, 2024
Page 7

- **BOLD Business Resource Group:** The Company has seven BRGs for employees, including the Black Organization of Leaders and Doers (BOLD). BOLD is an active group that has engaged in numerous initiatives to support and retain its members, including establishing professional development programs, mentorship opportunities, hosting a book club and lunch and learn sessions, celebrating Black History Month, sponsoring an African-American Partnership with the United Way, supporting volunteer opportunities, and collaborating with and sponsoring the following organizations: Lead Atlanta (an organization serving marginalized Black youth), the Atlanta Business League, the Urban League, and the Russell Innovation Center for Entrepreneurs (RICE Center), which is an Atlanta business generator supporting Black businesses and entrepreneurs.

- **McKinsey Program:** In 2022 and 2023, the Company participated in a prestigious McKinsey program which aims to increase representation of Black, Latino, and Asian employees.

- **Unconscious Bias Training:** From 2020 to 2023, approximately 2,000 senior leaders and employees across the enterprise have completed Unconscious Bias training, emphasizing the Company's commitment to fostering an inclusive workplace, preventing discrimination in the workplace, and retaining talent from all backgrounds.

The Company does not discriminate based on race. Rather, it embraces candidates and employees of various racial backgrounds and actively works to ensure it recruits, hires, and retains diverse candidates and specifically African-Americans. The efforts and investments above clearly demonstrate the Company's commitment to recruiting and hiring diverse candidates, including African-American candidates. These efforts directly undermine the Commissioner's allegations that the Company has discriminated against African-American candidates in recruiting and hiring. Quite the opposite, the Company has made substantial investments in recruiting and cultivating a diverse pipeline of African-American talent, and to supporting that talent through its DEI efforts.

**IV.    THE COMPANY'S EMPLOYEE POPULATION REFLECTS ITS ACTIVE COMMITMENT TO RECRUIT AND RETAIN AFRICAN-AMERICAN EMPLOYEES. THE COMPANY HAS MORE AFRICAN-AMERICAN EMPLOYEES THAN THE APPLICABLE LABOR POOL.**

The Commissioner's discrimination allegations are also inconsistent with the Company's workforce demographics. As the chart below demonstrates, the Company has a greater percentage of African-American employees in its workforce than what is available in the applicable labor pool, according to workforce demographic data actually published by the EEOC.

As a distributor of automotive replacement parts and supplies, the Company is classified by industry with the EEOC as NAICS code 441 – Motor Vehicle and Parts Dealers. The Company's 2023 Consolidated EEO-1 report shows that 11.7% of its workforce is Black or

August 8, 2024
Page 8

African-American.  *See* Exhibit E.  By comparison, only 9.9% of the employees working for U.S. employers in the same industry are Black or African-American.  *See* https://www.eeoc.gov/data/eeo-1-employer-information-report-statistics.

These workforce statistics do not show discrimination in recruiting or hiring towards African-Americans.  Indeed, based on EEOC's own data on the applicable labor pool, the Company's demographics directly undermine the Commissioner's allegation that the Company does not recruit or hire sufficient African-Americans or is somehow discriminating against them.  Rather, the demographics are consistent with the Company's active engagement and outreach in recruiting and hiring diverse candidates, including African-Americans.  There is simply no evidence of discrimination, and the Charge should be dismissed.



This chart compares the percentage of Black or African American employees in Genuine Parts Company's workforce to the percentage of Black or African American employees working at U.S. Motor Vehicle and Parts Dealers.
Genuine Parts Company's data comes from its 2023 Consolidated EEO-1 report. U.S. workforce data comes from the EEOC's Job Patterns for Minorities and Women in Private Industry (EEO-1) database, which reflects the 2021 North American Industry Classification System (NAICS) compilation for 441 Motor Vehicle and Parts Dealers within the U.S.

August 8, 2024
Page 9


## V.   THE COMMISSIONER'S CHARGE SHOULD BE DISMISSED.

Based on the above, EEOC should find that the Company has not violated Title VII, and the Commissioner's Charge should be dismissed.  The Company has demonstrated its commitment to recruiting, hiring, retaining, training, and supporting African-American candidates and employees, and there is no evidence of discrimination in any way.  For all of these reasons, the Company respectfully requests that EEOC dismiss the Commissioner's Charge.

Sincerely,

Shafeeqa W. Giarratani

Cc:     Sheila Ward-Reyes
        Emily M. Halliday

# EXHIBIT 3

# Ogletree
# Deakins

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
*Attorneys at Law*
301 Congress Avenue, Suite 1150
Austin, TX 78701
Telephone:  512-344-4700
Facsimile:  512-344-4701
www.ogletree.com

Erika L. Leonard
(512) 640-7090
erika.leonard@ogletree.com

May 23, 2025

**CONFIDENTIAL**
**VIA EEOC PORTAL**
Jonathon Harris
Equal Opportunity Investigator
U.S. Equal Employment Opportunity Commission
Dallas District Office
207 S. Houston St., 3rd Floor
Dallas, TX 75202

RE:  Commissioner Kalpana Kotagal v. Genuine Parts Company
EEOC Charge No. 450-2024-07829
Response to 4.3.25 and 4.10.25 Requests for Information

Dear Investigator Harris:

Genuine Parts Company d/b/a NAPA Auto Parts (hereinafter the "Company") submits the following responses and supporting documentation in response to your April 3 and 10, 2025 requests for information ("RFIs") in the above-referenced Charge.  The Company appreciates the extension of time to respond to these requests.  The Company reserves the right to supplement its objections and responses as additional information becomes available.[1]

The Company notes that its ability to meaningfully respond to the Charge and the RFIs, including to make appropriate legal and factual objections, is hampered by the lack of information

---

[1] This response includes confidential information and is not to be disclosed without the written approval of the Company. It is based on the Company's understanding of the facts and the information reviewed thus far and is submitted for the purpose of aiding EEOC in its investigation and facilitating the informal resolution of this matter. This response, while believed to be accurate, does not constitute an affidavit or a binding statement of the Company's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with the Commissioner's allegations. Because additional facts likely would be uncovered through adversarial discovery or following a full investigation, the Company in no way waives its right to present new or additional information at a later date, for substance or clarification. Moreover, by responding to the Charge and these RFIs, the Company does not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the Charge and the Commissioner's allegations.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Columbus ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ Salt Lake City ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

May 23, 2025
Page 2

about what the Commission is investigating.  Although we have requested clarification on the scope of the Charge on several occasions (and although the RFI invites us to contact you to obtain further clarification), the matter remains unclear.  The Charge states only that it relates to alleged "Failure to recruit Black candidates on the basis of their race" and "Failure to hire Black candidates on the basis of their race" "nationwide" since October 2019.  However, the Notice of Charge indicates: "The circumstances of the alleged discrimination are based on Race, and involve issues of Hiring that are alleged to have occurred on or about May 28, 2024," which was the date of the Notice.  The only additional information that the Company has been able to glean is from the RFIs, which specify that they relate to "store-related" positions.  The Company has made a good faith effort to understand the scope and focus of the Charge, and to respond accordingly and thoroughly in both its Position Statement and its responses to the agency's RFIs.  We invite further dialogue if you find that our response does not meet this goal.

The Company expressly incorporates all applicable arguments, information, and objections from its August 8, 2024 Position Statement into these responses. In addition, the Company generally objects to the overly broad and unduly burdensome scope of these requests. These requests seek nationwide information from a company with over 20,000 employees for a period of almost six years; but the Commission has not provided the Company with any specific allegations to support a broad assertion of discrimination against African-American candidates in recruiting and hiring.  Moreover, the requests seek information that is well out-side of the applicable limitations period of, at most 300 days.[2]  As such, the Company has limited its responses to the time period of August 2, 2023 (300 days before the Charge) to the present, and to those stores that are Company owned.[3]

The Company remains committed to cooperating with the agency's investigation and is confident that the agency will find that the allegations lack merit and should be dismissed with a no probable cause finding.  Subject to and without waiving its general and specific objections below, the Company responds as follows:

---

[2] Under 42 U.S.C. 2000e-5 ("Section 706"), charges must be filed within 180 days of the alleged unlawful employment practice, or 300 days if a state or local agency enforces a law prohibiting discrimination on the same basis.  Various courts have held that this statute of limitations applies to pattern or practice suits brought by EEOC, so EEOC cannot base discrimination allegations on events that occurred more than 180 days, or 300 days, prior to the charge date.  *See, e.g.*, *EEOC v. Waste Indus. U.S.A., LLC*, No. 1:23-cv-0429, 2024 BL 181527, at *7 (N.D. Ga. May 28, 2024); *EEOC v. Bass Pro Outdoor World, LLC*, 884 F. Supp. 2d 499, 523 (S.D. Tex. 2012); *EEOC v. Presrite Corp.*, No. 11-cv-260, 2012 BL 223145, at *2 (N.D. Ohio Aug. 30, 2012); *see also, e.g.*, Commission Opinion Letter: Section 707 (Sept. 3, 2020), available at https://www.eeoc.gov/laws/guidance/commission-opinion-letter-section-707 ("any claim the Commission pursues under section 707 must follow the procedures of section 706").  EEOC is time-barred from challenging any employment decisions prior to August 2, 2023, and the Company has limited its responses to the RFIs accordingly.

[3] As the Company explained in its Position Statement, for the stores that are not Company owned, the Company does not own, operate, or manage those businesses, nor does the Company have any input or oversight of their hiring and retention practices.

May 23, 2025
Page 3

## **GENERAL OBJECTIONS**

1.      The Company generally objects to the RFIs to the extent EEOC is pursuing matters outside of what is set forth in the Charge.  EEOC has not provided any factual basis for its allegations, and the information provided in the Company's Position Statement establishes that the Charge's allegations of recruiting and hiring discrimination against Black applicants are meritless.

2.      The Company generally objects to the RFIs to the extent that they are overly broad and unduly burdensome.

3.      The Company generally objects to the RFIs to the extent that they are vague, ambiguous, and contain terms and phrases that are undefined.  The Company also objects to EEOC requesting information and documents that the Company has already provided, which imposes an undue burden on the Company.

4.      The Company generally objects to the RFIs to the extent that they purport to seek information or documents that are not relevant to the subject matter of this Charge, beyond the scope of the Charge, beyond any specific allegation, assertion, or claim raised in the Charge, and purport to seek information or documents that are not reasonably calculated to lead to the discovery of relevant, admissible evidence in this Charge.

5.      The Company generally objects to the RFIs to the extent that they purport to seek information or documents not in the Company's possession, custody, or control.

6.      The Company generally objects to the RFIs to the extent that they purport to seek information or documents that constitute or contain trade secrets or confidential or proprietary business or personal information, and to the extent that they invade the privacy rights of applicants and/or employees.

7.      The Company generally objects to the RFIs as they purport to seek information or documents from October 1, 2019 to present.  As explained above, that time period is overbroad and beyond the permissible statute of limitations.  Accordingly, such requests seek information that is not relevant to the subject matter of this Charge and is not reasonably calculated to lead to the discovery of relevant, admissible evidence in this Charge.

8.      The Company generally objects to the RFIs to the extent that they purport to seek documents and/or information pertaining to personnel policies and practices other than those relating to the matters at issue in this Charge, and on the grounds that the documents and/or information sought are not relevant to the subject matter of this Charge and are not reasonably calculated to lead to the discovery of relevant, admissible evidence in this Charge.

9.      These general objections are incorporated by reference into each of the Company's responses to the RFIs.

May 23, 2025
Page 4

## SPECIFIC OBJECTIONS TO APRIL 3, 2025 RFI

1. In a sortable electronic format (such as Excel .xlsx), provide a list of each business location Respondent operated nationwide during the relevant period. For each location, provide the following:

   a. Facility name/Number;
   b. Street Address;
   c. State;
   d. Zip Code;
   e. Date of opening; and
   f. Date of closing, if applicable.

**RESPONSE:** See the Company's General Objections. Specifically, the Company objects to this request because it is overly broad, unduly burdensome, and seeks irrelevant information because it applies to all locations nationwide, regardless of whether they were Company owned, and regardless of the stores' hiring activity, over a period of six years. Subject to and without waiving those objections, the Company is working diligently to identify information responsive to this request and will supplement this response as soon as possible.

2. In a sortable electronic format (such as Excel .xlsx), identify all recruitment firms Respondent used to hire candidates at each of its locations nationwide during the relevant period. As follows, provide:

   a. Name of recruitment firm;
   b. Name of Respondent's point of contact at the recruitment firm;
   c. Beginning and end date(s) of contracts with the recruitment firm;
   d. Positions outsourced for recruitment referral;
   e. Telephone number(s) for the recruiting firm(s);
   f. E-mail addresses for the recruiting firm(s); and
   g. Respondent's contract with each recruitment firm identified that was in effect at any time during the relevant period.

**RESPONSE:** See the Company's General Objections. Specifically, the Company objects to this request because it is overly broad, unduly burdensome, and seeks irrelevant information because it applies to all locations nationwide, regardless of whether they were Company owned, over a period of six years. The Company also objects to this request because it is vague as to the meaning of "recruitment firm." Subject to and without waiving those objections, the Company incorporates its response to RFI 6 below, which explains that the Company's open positions are posted on third-party platforms including Indeed, LinkedIn, Glassdoor, ZipRecruiter, and Monster. The Company is also providing a copy of a current recruitment firm contract with Handler Executive Search, which the Company has used on occasion to assist with searches for high-level professionals, see the file provided at RFI 02. In addition, the Company uses Randstadt SourceRight to assist with Managed Services Programs, which focus on the Company's contingent or temporary workforce

May 23, 2025
Page 5

needs.  The Company has not located a contract with Randstadt at this time.  The Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

3.      In a sortable electronic format (such as Excel .xlsx), with labeled column titles, identify all job positions by job title at Respondent's locations nationwide during the relevant time period.  For each position provide:

   a.      Job position/title;
   b.      Department name;
   c.      Whether the job position was management or non-management; and
   d.      EEO-1 Classification as reflected in Respondent's EEO-1 reports filed during the relevant time period (i.e. Executive/Sr. Officials & Mgrs; First/Mid Officials & Mgrs; Professionals; Technicians; Sales Workers; Administrative Support; Craft Workers; Operatives; Laborers & Helpers; or Service Workers).

**RESPONSE:** See the Company's General Objections.  Specifically, the Company objects to this request because it is overly broad, unduly burdensome, and seeks irrelevant information because it applies to all locations nationwide, regardless of whether they were Company owned, and regardless of their hiring activity, over a period of six years.  The Company currently has over 20,000 employees nationwide, and the request is not limited to those positions where hiring occurred during the relevant period.  Subject to and without waiving those objections, the Company is working diligently to identify if there is a report that will be responsive to this request and will supplement this response as soon as possible.

4.      Provide a copy of the job description for each job position/title identified in 3(a).

**RESPONSE:** See the Company's General Objections.  Specifically, the Company objects to this request because it is overly broad, unduly burdensome, and seeks irrelevant information because it applies to all locations nationwide, regardless of whether they were Company owned, and regardless of their hiring activity, over a period of six years.  The Company currently has over 20,000 employees nationwide, and the request is not limited to those positions where hiring occurred during the relevant period.  Subject to and without waiving those objections, as explained in response to RFI 3, the Company is working diligently to identify if there is a report that includes the requested job title information, and it will supplement its response to this request accordingly as soon as possible.

5.      During the relevant period, explain how Respondent notified employees of job vacancies and promotional opportunities.

**RESPONSE:** See the Company's General Objections.  Specifically, the Company objects to this request because it is overly broad, unduly burdensome, and seeks irrelevant information because it applies to all locations nationwide, regardless of whether they were Company owned, over a period of six years.  In addition, the Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company.  There are no allegations that the Company has engaged in any discrimination during the promotion process, so requests for such

May 23, 2025
Page 6

information are not relevant to this investigation.  Subject to and without waiving those objections, see the Company's responses to RFI 6 below.   The Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

6.      Provide documents describing the methods Respondent uses to advertise and recruit for open positions. Additionally, explain whether applicants are sought through referral from current employees and if so, describe the referral process and how it is documented internally.

**RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company advertises and recruits for open positions through a number of different sources internally, externally, online, and in-person.

The Company uses various means to recruit qualified candidates online.  The Company posts job openings on its official Careers website (jobs.genpt.com).  In addition, the Company partners with Radancy, a recruitment marketing firm, to distribute its job postings across various platforms on the internet, so the Company's job postings may appear on various online platforms like Indeed, LinkedIn, Glassdoor, ZipRecruiter, and Monster.  The Company collaborates directly with LinkedIn and Indeed for paid promotion of its jobs on their respective platforms.  The Company also uses social media, such as LinkedIn, for recruiting.

The Company seeks to leverage its existing employees to recruit qualified candidates.  The Company has an employee referral program, and current employees are encouraged to recommend qualified candidates through incentives like bonuses or rewards.  The Company is providing a copy of its Referral Program Policy at RFI 06.  In addition, the Company leverages current employees' professional networks to tap into passive talent pools.

The Company works with third-party agencies or headhunters, as needed, to source specialized or hard-to-fill roles, particularly as part of the executive search process.  The Company uses temporary staffing firms for short-term or project-based needs.  See the Company's response to RFI 2.

The Company hosts and participates in various in-person and online recruiting fairs and events.  For example, the Company attends college career fairs and organizes events to connect with recent graduates and interns.  The Company also participates in on-campus recruitment events by partnering with universities to source talent for entry-level positions.  The Company attends a variety of networking events, such as industry events, tradeshows, or associations, to build relationships with talent.  In addition, the Company hosts its own job fairs, and attends other job fairs, to engage with candidates both in-person and virtually.

The Company uses its applicant tracking system for talent pipeline development, as a database of potential candidates for future openings.  The Company reaches out to passive candidates via email, phone, or LinkedIn messaging to discuss potential opportunities, and also searches through results in online databases like LinkedIn and Indeed to find resumes that match job requirements.

May 23, 2025
Page 7

The Company establishes partnerships with a variety of organizations and values community engagement as a recruitment source. For example, the Company partners with various local organizations and non-profits to increase visibility to qualified applicants, and engages with community groups to identify top talent. The Company also establishes partnerships with trade schools, professional organizations, and workforce development programs to source talent. As a federal contractor, the Company works with JobTarget to ensure OFCCP compliance by posting to government job boards and veterans' and disability-focused organizations, and the Company engages in targeted recruitment of qualified protected veterans and individuals with disabilities. The Company also works with local organizations, like the Shepard Center, to place qualified individuals with disabilities into open job roles.

The Company may accept resumes from walk-in applicants at its retail store locations, but all applicants are directed to apply online through Workday.

The Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

7.      Describe in detail the hiring process for Respondent's job positions from October 1, 2019, through the relevant period. In responding, please include the following:

    a.      A copy of any blank applications used during the relevant time period, as well as description of where and how a prospective applicant obtains and submits an application (including both in-person and online methods);

    b.      The name and job position/title of all individuals to whom completed applications are submitted;

    c.      A description of the factors used to determine whether an applicant is interviewed, a description of how the invitation to interview is communicated to an applicant and recorded internally, and the name and job position of all individuals that determine whether an applicant is interviewed;

    d.      State whether applicant interviews are conducted in-store or by a corporate representative. Identify the job position/title of the individuals conducting the interviews, the job position/title of the person with final hiring authority, and whether such individuals work in-store or at the corporate level.

    e.      A description of the factors used to determine whether an applicant receives a job offer, and the job position/title that determine whether an applicant receives a job offer, and how the decision is documented internally;

    f.      A description of any post-offer steps (e.g., drug test, background check) that an applicant must complete before starting work; and

    g.      Describe how applicants are notified that they have been offered or not offered a position.

**RESPONSE:** See the Company's General Objections. Subject to and without waiving those objections, the Company's hiring process is focused on identifying candidates that possess the skills necessary to contribute to the team. Candidates can explore available opportunities

May 23, 2025
Page 8

through the Company's Careers webpage, where they will find detailed job descriptions and requirements.  Applications are submitted online by completing an application form and attaching a resume, cover letter, or any other documents to support the candidate's qualifications.  Prospective employees can obtain and submit an application by visiting https://jobs.genpt.com.

The Company's recruitment team reviews applications to ensure candidates meet the qualifications and experience specific to the role.  The following kinds of factors are used to determine whether an applicant is selected for an interview with a recruiter:

- **Relevant Skills and Experience:** Consideration is given to how closely the applicant's skills and experience align with the job description, including technical expertise and, where applicable, industry knowledge required for the role.  Job descriptions and postings are regularly reviewed to ensure that the requirements are job-related and necessary for the role.  As part of the Job Posting and Requisition review process, Hiring Managers collaborate with the People Partners to carefully review job descriptions.  This ensures that the qualifications and requirements outlined are aligned with the specific responsibilities of the role.

- **Educational Background:** Preferred or required educational qualifications, as specified in the job description, are evaluated.

- **Work Experience:** Relevant years of work experience, as outlined in the job description, are assessed.

- **Location and Availability:** If specific location or availability requirements are defined as part of the job duties, these are reviewed for alignment.

- **Minimum Requirements:** The applicant must meet all minimum qualifications and requirements detailed in the job description.

- **Prescreening Evaluation:** Applicants are referred to hiring managers only if they meet all required qualifications and demonstrate suitability based on their responses to any prescreening questions designed to evaluate baseline compatibility with the role.

Applicants are invited to an interview by a Talent Acquisition Specialist or Talent Acquisition Coordinator based on the results of their initial prescreening.  The individual responsible for determining whether an applicant is eligible for an interview is the assigned Talent Acquisition Specialist.  This responsibility may also be fulfilled by employees holding the titles Talent Acquisition Manager, or Talent Acquisition Coordinator.

For in-store positions, interviews are not conducted at the corporate level.  Instead, the following employees may be involved in interviewing candidates for in-store and sales roles: Talent Acquisition Specialists; Talent Acquisition Managers; Talent Acquisition Coordinators; Store Managers; Assistant Store Managers; District Managers.

May 23, 2025
Page 9

Candidates may participate in an initial phone or virtual interview to discuss their background, experience, and interest in joining the Company. This stage may also include preliminary questions to assess knowledge relevant to the industry or profession of focus. For many roles, candidates are invited to an in-person or virtual interview with hiring managers or team leaders. Behavioral and situational questions may be used to assess problem-solving abilities, teamwork, and alignment with the Company's culture. Candidates are assessed based on a set of core competencies and the Company's core values.

Final hiring authority for in-store roles rests with Store Leadership, which may include Store Managers, Assistant Store Managers, or District Managers.

If a candidate is selected for an offer, the Talent Acquisition Specialist will extend a verbal offer and notify the People Partner of the candidate's acceptance. The People Partner will initiate the offer letter in Workday which outlines specific details such as position, salary, and other benefits. Once the offer is signed, an Onboarding Coordinator will contact the candidate to initiate the required drug screening and background check process.

Upon successful completion of the drug screening and background check, the candidate will be contacted by a local People Partner to begin the onboarding process.

Please note that prior to Q2 2024, the Company's talent acquisition process was more decentralized, as hiring managers were responsible for owning all aspects of the talent acquisition process. After Q2 2024, the Company centralized its recruiting function, shifting much of the responsibility from hiring managers to a team of assigned recruiters as described above. Today, recruiters oversee the sourcing, screening, and recommendation of candidates who meet the job requirements. Hiring managers are still involved in the later stages of the process, primarily through candidate review, in-person interviews, and providing feedback for final hiring decisions.

A copy of a current Workday application is attached at RFI 07.

The Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

8.    Please explain at which step of the application process a person is considered a job applicant, how long an application is active, and whether a person may apply for a job when Respondent is not hiring.

**RESPONSE:** See the Company's General Objections. Subject to and without waiving those objections, an individual must complete and submit an application through the Company's applicant tracking system Workday to be considered an applicant. Applicants are dispositioned during the application process, including once a requisition has been filled or closed. The Company utilizes Evergreen requisitions to build a talent pipeline for certain positions. The

May 23, 2025
Page 10

Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

9.  Please provide copies of documents which outline the Respondent's promotion procedures, protocols, guidance, instructions, handbooks, training materials or other documents that describe Respondent's application, hiring, interview, or promotion or selection policies or procedures. If informal procedures are used for internal promotions, please provide any documents that describe any policies or procedures that guide or regulate how those positions are filled.

**RESPONSE:** See the Company's General Objections.  Specifically, the Company objects to this request because it seeks irrelevant information.  The Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company.  There are no allegations that the Company has engaged in any discrimination during the promotion process, so requests for such information are not relevant to this investigation.

10.  Please provide copies of documents which outline the Respondent's hiring policies and procedures, protocols, guidance, instructions, handbooks, training materials or other documents that describe Respondent's application, hiring, interview, or hiring or selection policies or procedures. If informal procedures are used for hiring, please provide any documents that describe any policies or procedures that guide or regulate how those positions are filled.

**RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company incorporates Exhibit A (2023 Code of Conduct excerpts) and Exhibit B (Human Rights Policy), which were provided with the Company's Position Statement, as well as its response to RFI 16.  In addition, the Company has provided a copy of its Referral Program Policy in response to RFI 6.  The Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

11.  Describe Respondent's retention policies as they apply to application materials (e.g., applications, interview notes).

**RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company's retention policy states that it retains applications for individuals who were hired permanently and applications for individuals who were not hired for three years.

12.  State Respondent's legal status (e.g., corporation, partnership, tax-exempt non-profit, etc.). If incorporated, identify the state of incorporation.

**RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company is a Georgia corporation.

13.  Provide a complete organizational chart of your organization and organization's leadership. Additionally, identify each person's title, as well as their role in the

May 23, 2025
Page 11

organization's leadership structure.

**RESPONSE:** See the Company's General Objections. Subject to and without waiving those objections, the Company does not maintain an official organizational chart.

14.     Provide the name, title, and address of Respondent's Custodian(s) of Records.

**RESPONSE:** See the Company's General Objections. Subject to and without waiving those objections, the Company does not have a Custodian of Records, but its Employee Service Center manages employee documents. All correspondence regarding this matter, including records requests, should be directed to the Company's counsel at Ogletree Deakins.

15.     Identify and explain in full the relationship between Genuine Auto Parts, and NAPA Auto Parts; Provide supporting documentation, if any.

**RESPONSE:** See the Company's General Objections. Subject to and without waiving those objections, Genuine Parts Company is the parent company of NAPA Auto Parts.

16.     Submit copies of all written rules, policies and procedures in effect during the relevant time period relating to the following topics. If such does not exist in written form, provide a detailed explanation of the rules, policies, and procedures.

        a.      Race Discrimination
        b.      Equal Employment Opportunity in hiring and promotions.
        c.      Procedures for complaining about race discrimination, discriminatory hiring, and/or discriminatory promotion.

**RESPONSE:** See the Company's General Objections. Subject to and without waiving those objections, see Exhibit A (2023 Code of Conduct excerpts) and Exhibit B (Human Rights Policy), which were provided with the Company's Position Statement. Additional responsive excerpts from the 2023 Code of Conduct, along with responsive sections of the 2023, 2024, and 2025 Employee Handbook and 2025 Code of Conduct are provided at RFI 16.

17.     For the relevant time period, provide copies of all training, guidance, or instruction that Respondent's managers and/or employees have received from Respondent relating to the recruitment and/or hiring of in-store management and non-management employees. With respect to the training, provide the following:

        a.      Date of training;
        b.      Detailed description of audience trained;
        c.      Topics covered;
        d.      Names and titles of those who conducted the training and  copy  of CV/Resume; and,
        e.      Copies of training materials used and distributed during the training.

May 23, 2025
Page 12

**RESPONSE:** See the Company's General Objections. Subject to and without waiving those objections, the Company does not offer trainings to employees or managers on the recruiting process, though the Company does publish job aids to assist with using the Workday system.

18.     For the relevant time period, for each in-store management and non-management position, provide the pay rate and benefits offered, and all guidance/policies used to set salary or wage levels, bonuses or merit increases. Please also include documentation which reflects all benefits provided by Respondent for each position.

**RESPONSE:** See the Company's General Objections. Specifically, the Company objects to this request because it is overly broad and unduly burdensome. The Company further objects to this request because it seeks irrelevant information. The Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company. There are no allegations that the Company has engaged in any form of discrimination involving compensation or benefits, so requests for such information are not relevant to this investigation.

**Corporate Representative:** EEOC is also requesting to interview a corporate representative(s) who can answer questions on the following topics:

Respondent's nationwide hiring process for all store-related management and non-management positions since October 1, 2019, including the identification of relevant decisionmakers and the role of any third-party agencies. With respect to this topic, the Commission seeks a corporate representative who can speak to the breakdown of all nationwide management and non-management store-related positions;

1. Respondent's recruitment practices/plans, including the use of third parties, e.g., LinkedIn, Indeed, and Craigslist;
2. Respondent's internal promotion/demotion/transfer practices;
3. Information that Respondent collects/maintains on recruitment sources and, if so, where that information stems from, where it is maintained and for how long, and how most employees/applicants learn of job openings at Respondent;
4. Respondent's minimal qualifications for employment;
5. Job requirements for all positions;
6. Various avenues by which Respondent accepts applications and whether the avenues vary by position

**RESPONSE:** See the Company's General Objections. Specifically, the Company objects to this request for a corporate representative because the topics are overly broad, unduly burdensome, and seek irrelevant information because they apply to all locations nationwide, regardless of whether they were Company owned, and regardless of the stores' hiring activity, over a period of six years. The Company also additionally objects to topic 2 because it seeks irrelevant information. The Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company. There are no allegations that the Company has engaged in any discrimination during the promotion, demotion, or transfer processes, so requests for such information are not relevant to this investigation. Subject to and

May 23, 2025
Page 13

without waiving those objections, the Company identifies Cassie Bell, SVP of People USA APG as its corporate representative. Please coordinate availability for this interview through the Company's counsel at Ogletree Deakins. The Company's response will be limited to the period August 2, 2023 to present and to Company owned stores.

## SPECIFIC OBJECTIONS TO APRIL 10, 2025 RFI

### SECTION I. Request for Description of Electronic Information

1. For **each** system/software used during the investigative period of October 1, 2019, to present, please provide the following information:

    a. The name and version of the system/software and components.

    b. The date on which the company started using the relevant system/software. Name the predecessor system/software (if any) and dates used. (Note: If a software change occurred during the investigative period of October 1, 2019, to present, please continue to provide all descriptive items (a-h) for **each** system/software used during this period.)

    c. Estimate the number of records in the system/software.

    d. Estimate the number of applicants and employees in the system/software. (Note: The number of records is often different from the number of applicants or employees since systems/software often house more than one record of information per applicant or employee.)

    e. Describe the categories of any applicants and employees that have been excluded from the system/software.

    f. Produce the name and commonly understood description of **each** data field or variable on the system component(s) and indicate which data fields or variables are populated and utilized in the system. The "key variable" or unique identifier common to all components should be clearly defined. (Note: Please provide in an Excel or similar spreadsheet. PDF is not acceptable. If this information cannot be written into a comma delimited file (".csv"), a data base file (".dbf"), or other commonly used software (specifically, Excel, MS Access, dBase, SAS, STATA or SPSS), then provide file documentation, including file layout and field formats. That is, specify the beginning field and length of each variable, whether the variable is alpha or numeric, and the format of each variable, such as date formats or numeric formats indicating decimals or packed data.)

    g. Produce the definition of all codes used in the system/software identified in Part 1.f. above. (Note: Please provide in an Excel or similar spreadsheet. PDF is not acceptable.)

    h. Identify whether data can be exported from the system/software into an Excel or similar spreadsheet (for example, ".xls", ".xlsx", ".csv", ".dbf"). If data cannot be exported into an Excel or similar spreadsheet, indicate the file formats into which data can be exported.

    i. If the systems/software is maintained by an outside organization, please list the system/software with the name and address of the outside organization and the inclusive dates of the contract or arrangement. (*Note: In this instance, the Commission continues to request that you produce the descriptive items presented above (a-h).*)

May 23, 2025
Page 14

**RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company uses Workday as its Human Resources Information System and Applicant Tracking System.  The Company started using Workday on June 1, 2023.  The system version is 2025.19, and the code version is 2025.19.1103.  There are over 380,000 U.S. applications and over 18,000 active U.S. employees stored in the Company's Workday system.  Executive recruiting candidates have been excluded from the Workday system.  Due to the high volume of information, data fields, and variables potentially available in the Workday system, the Company respectfully requests clarification from the agency about the type of information requested in subparts (c), (f), and (g).  Data can be exported from Workday into Excel or a similar spreadsheet format.  The Workday system is maintained in-house by the Company.  The Company's responses are limited to the Company's U.S. operations, to the period August 2, 2023 to present, and to Company owned stores.

**SECTION II. Additional Requests**

1. Produce an unredacted personnel file for one successful applicant for a non-managerial retail position. The personnel file should include copies or print screens of application materials, including results of interview and any pre-employment screenings. Each personnel file should represent an employee who was hired at Respondent on or after October 1, 2019.

**RESPONSE:** See the Company's General Objections.  Specifically, the Company objects to this request because it seeks irrelevant information.  The Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company.  Therefore, a request for personnel file information of current employees is not relevant to this investigation.  Subject to and without waiving those objections, the Company is providing candidate information from its Workday system for an employee who was hired for a non-managerial position by the Company since August 2, 2023 at Section II RFI 1.

2. Produce an unredacted copy of all application materials for one unsuccessful applicant for a non-managerial retail position. If hard copies of these documents do not exist, please provide screenshots from the Applicant Tracking System which stores this information. Results of interviews and any pre-employment screenings should be included. Each applicant file should represent an individual who applied to Respondent on or after October 1, 2019.

**RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company is providing candidate information for an unsuccessful non-managerial applicant since August 2, 2023 from its Workday system at Section II RFI 2.

3. Produce an unredacted personnel file for one successful applicant for a managerial position. The personnel file should include copies or print screens of application materials, including results of interview and any pre-employment screenings. Each personnel file should represent an employee who was hired at Respondent on or after October 1, 2019.

May 23, 2025
Page 15

**RESPONSE:** See the Company's General Objections.  Specifically, the Company objects to this request because it seeks irrelevant information.  The Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company. Therefore, a request for personnel file information of current employees is not relevant to this investigation.  Subject to and without waiving those objections, the Company is providing candidate information from its Workday system for an employee who was hired for a managerial position by the Company since August 2, 2023 at Section II RFI 3.

4. Produce an unredacted copy of all application materials for one unsuccessful applicant for a managerial position. If hard copies of these documents do not exist, please provide screenshots from the Applicant Tracking System which stores this information. Results of interviews and any pre-employment screenings should be included. Each applicant file should represent an individual who applied to Respondent on or after October 1, 2019.

**RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company is providing candidate information for an unsuccessful managerial applicant since August 2, 2023 from its Workday system at Section II RFI 4.

**SECTION III. Request for a Description of Data-Driven Algorithms, Artificial Intelligence2 (AI), or Machine Learning Used for Recruitment, Screening, Selection, and/or Promotion**

1. Indicate whether Respondent uses algorithms, AI or other automated technology that rate, rank, or assess/test individuals that are used in any of Respondent's recruitment, screening, selection and promotion processes (hereafter "employment processes") such as rating or scoring applicants or employees

If yes, provide the following:
     a. Identify the dates for which the algorithms, AI or other automated technology system(s) were used by the Respondent and to the extent that the use has changed
     over time, include the dates of each change and describe what changes were made and why.
     b. Describe the purpose or objective(s) of the [algorithms, AI or other automated technology] system(s), including identifying each point in the process where it is used in the employment process or in decision-making.
     c. Identify which entity maintains the [algorithms, AI or other automated technology] system, e.g. the Respondent or Third-Party vendor.

**RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company does not use any algorithms, AI, or other automated technology that rates, ranks, or assesses/tests individuals in any of the Company's recruitment, screening, and selection processes.

2. For algorithms, AI or other automated technology maintained by Respondent, provide the names, titles, and mailing address, email address, and phone number of persons involved in the implementation, management, and oversight of the algorithms, AI or other automated technology

May 23, 2025
Page 16

system, including, but not limited to, those who create, supervise, maintain, or manage the system on behalf of Respondent. Describe the role each individual plays in this process.

**RESPONSE:**  See the Company's General Objections.  Subject to and without waiving those objections, see the response to Section III, RFI 1.

3. For algorithms, AI or other automated technology systems maintained by a third-party vendor or that was purchased from a technology vendor, provide the following:

> a. The entity name, the type of the algorithms, AI or other automated technology system used, mailing address, email address, phone number for the entity, and, the dates of the contract or arrangement.
> b. Describe the nature of the contract for the services and provide a copy of the contract.
> c. Provide the name, title, mailing address, email address, and phone number of each person at Respondent responsible for selection of, implementation, management, and oversight of the algorithms, AI or other automated technology system.

**RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, see the response to Section III, RFI 1.

4. Identify which decisions are made based (in whole or in part) on the outcome of the algorithms, AI or other automated technology system. Specifically:

> a. Describe the decision(s) made.
> b. Which employment decisions were based in whole or in part on the output of the AI or algorithmic technology system and give related dates for those decisions.,
> c. List all decision makers by name and job title, such as recruitment personnel, hiring managers, and supervisors, who used or whose employment decisions were informed by the algorithms, AI or other automated technology system.

**RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, see the response to Section III, RFI 1.

5. Provide a copy of all manuals, handbooks, or training materials on the algorithms, AI or other automated technology system(s) and/or its outputs developed by the third-party vendor, technology vendor, and/or Respondent.

**RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, see the response to Section III, RFI 1.

May 23, 2025
Page 17

## <u>CONCLUSION</u>

We hope that these responses and supporting documents adequately address your questions. As set forth in the Company's Position Statement, and as further demonstrated by the responses and documents produced here, the Company does not discriminate against African-American candidates in recruiting and hiring. We respectfully renew our request for a no probable cause finding.

Sincerely,

Erika L. Leonard


Cc:    Sheila Ward-Reyes
       Emily M. Halliday

# EXHIBIT 4

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Dallas District Office**

207 S. Houston Street, 3rd Floor
Dallas, TX  75202-4726
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
Dallas Direct Dial: (972) 918-3580
FAX: (214) 253-2720
Website:  www.eeoc.gov

June 5, 2025

Genuine Parts Company
c/o Erika L. Leonard
Ogletree Deakins
301 Congress Avenue,
Suite 1150
Austin, TX 78701

VIA EMAIL to erika.leonard@ogletree.com

> Re:     Deficiency letter in regard to Respondent's May 23, 2025, RFI Response,
>         Kalpana Kotagal v. Genuine Parts Company, Charge No. 450-2024-07829

Ms. Leonard,

The United States Equal Employment Opportunity Commission ("EEOC") has the authority to investigate to determine if an employer has engaged in unlawful practices. Respondent received its first Request for Information from EEOC on April 3, 2025. Respondent received its second Request for Information from EEOC on April 10, 2025. On May 23, 2025 Respondent provided a response to both Requests for Information that was deficient and lacked the necessary information required to continue this investigation. The EEOC respectfully requests complete responses to all requests for information.

In an effort to facilitate complete responses, the EEOC provides the following clarifying information in response to specific concerns identified by Respondent:

**April 10, 2025 Section I Subpart C Clarification**: The EEOC is requesting the number of unique application records and the number of unique employee records in the referenced systems. Your response in the paragraph is sufficient (i.e., "380,000 U.S. applications and over 18,000 active U.S. employees") to the extent it provides the total number of unique application records and the number of unique employee records in Workday between August 2, 2023 and the present. However, the request spans October 1, 2019 to present, not just August 2, 2023 to present. Since Workday was implemented June 1, 2023, you must also provide the number of unique application records and the number of unique employee records in any predecessor system(s) used from October 1, 2019 to May 31, 2023.

**April 10, 2025 Section I Subpart F and G Clarification**: The EEOC is requesting the name and commonly understood description of each data field or variable that corresponds to the specific categories of information outlined in our original request (see the second and third paragraphs of our RFI for the complete list of applicant and employee data categories). For example, for applicant name, we need the specific field name in Workday (e.g., "Applicant_Full_Name"), the commonly understood description (e.g., "Full name of applicant associated with the application record"), and whether the field is populated and utilized. The unique identifier represents the field used in Workday to uniquely identify applicants and applications in the ATS module and to uniquely identify employees in the HRIS module. We confirm that export to comma-delimited format is acceptable.

**Scope of requests:** The EEOC requests information related to Respondent's nationwide hiring process for all store-related management and non-management positions since October 1, 2019. Respondent objects to the temporal scope of the information requested and improperly limited its responses to a time period dating back to August 2, 2023. The charge of discrimination alleges a continuing violation dating from October 2019. Therefore, the temporal scope of the request is tailored to information that is relevant to the matters under investigation. Whether EEOC would ultimately be able to hold Respondent liable for discrimination occurring 300 days before the charge is irrelevant to EEOC's authority to seek information during an administrative investigation prior to 300 days before the charge.[1] Systemic investigations of allegedly discriminatory hiring practices necessarily require a broad data set. Respondent must supplement its responses to include the requested information.

**Timing of responses:** Respondent stated its intent to provide responses to a number of requests but indicated it is still working to collect the necessary information. For all such responses, the EEOC clarifies that a full and final response, covering the period October 1, 2019 to the present, is due _no later than June 26, 2025_.

Pursuant to 710 of Title VII of the Civil Rights Act of 1964 as amended and the Commission's Procedural Regulations (29 C.F.R. 1601.16), if we do not receive your client's response, the Commission may subpoena the information without any further notice to you. Alternatively, if you fail to respond as instructed herein, the Commission can infer that your refusal to provide a substantive response is detrimental to Respondent's position. Therefore, the Commission may draw an adverse inference against Respondent as to the information sought.

Please respond to the following request for more information and provide the information **to ensure our receipt no later than June 26, 2025.** Your client's cooperation regarding this request will be greatly appreciated.

Sincerely,

Digitally signed by JONATHON HARRIS
Date: 2025.06.05 10:18:17 -05'00'

**Jonathon Harris**
Jonathon Harris
Equal Opportunity Investigator

---

[1] _EEOC v. Waste Indus. U.S.A. LLC,_ No. 1:23-cv-04293-JPB-JEM, 2024 WL 4344954 (N.D. Ga. May 28, 2024) cited by Respondent in footnote 2 of its May 23, 2025 letter, supports the scope of EEOC's request here. In _Waste Indus._, the court held that the continuing violation doctrine applies to EEOC's pattern or practice hiring claim and denied the defendant's motion to dismiss any claim arising more than 180 days before the underlying charge was filed. _Id._ at * 8. EEOC notes that the case cites to _EEOC v. Waste Indus._ and _EEOC v. Presrite Corp._ in Respondent's letter are not to Westlaw or Lexis. If Respondent cites case law in future correspondence, EEOC requests that Respondent provide Westlaw or Lexis cites for any unpublished decisions or provide copies of decisions unavailable on Westlaw or Lexis.

# EXHIBIT 5

# Ogletree
# Deakins

OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
*Attorneys at Law*
301 Congress Avenue, Suite 1150
Austin, TX 78701
Telephone:  512-344-4700
Facsimile:  512-344-4701
www.ogletree.com

Erika L. Leonard
(512) 640-7090
erika.leonard@ogletree.com

June 26, 2025

**CONFIDENTIAL**
**VIA EEOC PORTAL**
Jonathon Harris
Equal Opportunity Investigator
U.S. Equal Employment Opportunity Commission
Dallas District Office
207 S. Houston St., 3rd Floor
Dallas, TX 75202

     RE:  Commissioner Kalpana Kotagal v. Genuine Parts Company
           EEOC Charge No. 450-2024-07829
           Supplemental Response to 4.3.25 and 4.10.25 Requests for Information

Dear Investigator Harris:

     Genuine Parts Company d/b/a NAPA Auto Parts (hereinafter the "Company") submits the following supplemental responses and supporting documentation in response to your June 5, 2025 letter, requesting additional information in response to EEOC's April 3 and 10, 2025 Requests For Information ("RFIs") in the above-referenced Charge. The Company reserves the right to supplement its objections and responses as additional information becomes available.[1]

     The Company reiterates it position that it cannot fully object and respond to the Charge and the RFIs because the Charge and Notice of Charge do not provide sufficient information about

---

[1] This response includes confidential information and is not to be disclosed without the written approval of the Company. It is based on the Company's understanding of the facts and the information reviewed thus far and is submitted for the purpose of aiding the EEOC in its investigation and facilitating the informal resolution of this matter. This response, while believed to be accurate, does not constitute an affidavit or a binding statement of the Company's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with the Commissioner's allegations. Because additional facts likely would be uncovered through adversarial discovery or following a full investigation, the Company in no way waives its right to present new or additional information at a later date, for substance or clarification. Moreover, by responding to the Charge and these RFIs, the Company does not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the Charge and the Commissioner's allegations.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Columbus ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ Salt Lake City ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

June 26, 2025
Page 2

the allegations against the Company.  The Charge states only that it relates to alleged "Failure to recruit Black candidates on the basis of their race" and "Failure to hire Black candidates on the basis of their race" "nationwide" since October 2019.  However, the Notice of Charge indicates: "The circumstances of the alleged discrimination are based on Race, and involve issues of Hiring that are alleged to have occurred on or about May 28, 2024," which was the date of the Notice. The only additional information that the Company has been able to glean is from the RFIs, which specify that they relate to "store-related" positions, and from EEOC's June 5 letter, which states that the "EEOC requests information related to Respondent's nationwide hiring process for all store-related management and non-management positions since October 1, 2019," and that the Charge alleges a "continuing violation dating from October 1, 2019."  Once again, the Company has made a good faith effort to understand the scope and focus of the Charge, and to respond accordingly and thoroughly in its Position Statement, its May 23, 2025 responses to the agency's RFIs, and in today's supplemental responses.  But, it is the Company's position that EEOC has not provided adequate details about the basis for its investigation to allow for a meaningful response and defense.

The Company continues to object to any requests for information that extend beyond the 300-day statute of limitations period as overly broad, unduly burdensome, and beyond the scope of the EEOC's investigation and enforcement authority.  The Company also objects to the EEOC's apparent position that individual hiring decisions, made at the individual store level, over two thousand individual Company-owned retail stores nationwide, since 2019, can constitute a single continuing violation by the Company.  However, the Company is providing additional information, dating back to October 1, 2019, where applicable and available, based on its reasonable investigation to date, in a good faith attempt to cooperate with the agency and resolve this investigation.  In making today's supplemental response, the Company expressly incorporates, and does not waive, any applicable arguments, information, and objections from its August 8, 2024 Position Statement, the general and specific objections from its May 23 RFI responses, and the objections stated above.

June 26, 2025
Page 3

## **<u>GENERAL OBJECTIONS</u>**

1.      The Company generally objects to the RFIs to the extent EEOC is pursuing matters outside of what is set forth in the Charge.  EEOC has not provided any factual basis for its allegations, and the information provided in the Company's Position Statement establishes that the Charge's allegations of recruiting and hiring discrimination against Black applicants are meritless.

2.      The Company generally objects to the RFIs to the extent that they are overly broad and unduly burdensome.

3.      The Company generally objects to the RFIs to the extent that they are vague, ambiguous, and contain terms and phrases that are undefined.  The Company also objects to EEOC requesting information and documents that the Company has already provided, which imposes an undue burden on the Company.

4.      The Company generally objects to the RFIs to the extent that they purport to seek information or documents that are not relevant to the subject matter of this Charge, beyond the scope of the Charge, beyond any specific allegation, assertion, or claim raised in the Charge, and purport to seek information or documents that are not reasonably calculated to lead to the discovery of relevant, admissible evidence in this Charge.

5.      The Company generally objects to the RFIs to the extent that they purport to seek information or documents not in the Company's possession, custody, or control.

6.      The Company generally objects to the RFIs to the extent that they purport to seek information or documents that constitute or contain trade secrets or confidential or proprietary business or personal information, and to the extent that they invade the privacy rights of applicants and/or employees.

7.      The Company generally objects to the RFIs as they purport to seek information or documents from October 1, 2019 to present.  As explained above, that time period is overbroad and beyond the permissible statute of limitations.  Accordingly, such requests seek information that is not relevant to the subject matter of this Charge and is not reasonably calculated to lead to the discovery of relevant, admissible evidence in this Charge.

8.      The Company generally objects to the RFIs to the extent that they purport to seek documents and/or information pertaining to personnel policies and practices other than those relating to the matters at issue in this Charge, and on the grounds that the documents and/or information sought are not relevant to the subject matter of this Charge and are not reasonably calculated to lead to the discovery of relevant, admissible evidence in this Charge.

9.      These general objections are incorporated by reference into each of the Company's responses to the RFIs.

June 26, 2025
Page 4

## <u>SUPPLEMENTAL RESPONSES TO APRIL 3, 2025 RFI</u>

1.     In a sortable electronic format (such as Excel .xlsx), provide a list of each business location Respondent operated nationwide during the relevant period. For each location, provide the following:

    a.    Facility name/Number;
    b.    Street Address;
    c.    State;
    d.    Zip Code;
    e.    Date of opening; and
    f.    Date of closing, if applicable.

**INITIAL RESPONSE:** See the Company's General Objections. Specifically, the Company objects to this request because it is overly broad, unduly burdensome, and seeks irrelevant information because it applies to all locations nationwide, regardless of whether they were Company owned, and regardless of the stores' hiring activity, over a period of six years. Subject to and without waiving those objections, the Company is working diligently to identify information responsive to this request and will supplement this response as soon as possible.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, supplements its May 23 response to provide a spreadsheet containing the requested information for its Company owned retail stores, from October 1, 2019 to present. See the file provided at RFI 01.

2.     In a sortable electronic format (such as Excel .xlsx), identify all recruitment firms Respondent used to hire candidates at each of its locations nationwide during the relevant period. As follows, provide:

    a.    Name of recruitment firm;
    b.    Name of Respondent's point of contact at the recruitment firm;
    c.    Beginning and end date(s) of contracts with the recruitment firm;
    d.    Positions outsourced for recruitment referral;
    e.    Telephone number(s) for the recruiting firm(s);
    f.    E-mail addresses for the recruiting firm(s); and
    g.    Respondent's contract with each recruitment firm identified that was in effect at any time during the relevant period.

**INITIAL RESPONSE:** See the Company's General Objections. Specifically, the Company objects to this request because it is overly broad, unduly burdensome, and seeks irrelevant information because it applies to all locations nationwide, regardless of whether they were Company owned, over a period of six years. The Company also objects to this request because it is vague as to the meaning of "recruitment firm." Subject to and without waiving those objections, the Company incorporates its response to RFI 6 below, which explains that the Company's open positions are posted on third-party platforms including Indeed, LinkedIn, Glassdoor, ZipRecruiter,

June 26, 2025
Page 5

and Monster. The Company is also providing a copy of a current recruitment firm contract with Handler Executive Search, which the Company has used on occasion to assist with searches for high-level professionals, see the file provided at RFI 02. In addition, the Company uses Randstadt SourceRight to assist with Managed Services Programs, which focus on the Company's contingent or temporary workforce needs. The Company has not located a contract with Randstadt at this time. The Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and confirms that its May 23 response is accurate for Company owned retail stores for the period dating back to October 1, 2019.

3.      In a sortable electronic format (such as Excel .xlsx), with labeled column titles, identify all job positions by job title at Respondent's locations nationwide during the relevant time period. For each position provide:

      a.      Job position/title;
      b.      Department name;
      c.      Whether the job position was management or non-management; and
      d.      EEO-1 Classification as reflected in Respondent's EEO-1 reports filed during the relevant time period (i.e. Executive/Sr. Officials & Mgrs; First/Mid Officials & Mgrs; Professionals; Technicians; Sales Workers; Administrative Support; Craft Workers; Operatives; Laborers & Helpers; or Service Workers).

**INITIAL RESPONSE:** See the Company's General Objections. Specifically, the Company objects to this request because it is overly broad, unduly burdensome, and seeks irrelevant information because it applies to all locations nationwide, regardless of whether they were Company owned, and regardless of their hiring activity, over a period of six years. The Company currently has over 20,000 employees nationwide, and the request is not limited to those positions where hiring occurred during the relevant period. Subject to and without waiving those objections, the Company is working diligently to identify if there is a report that will be responsive to this request and will supplement this response as soon as possible.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, supplements its May 23 response to provide spreadsheets containing the requested information for Company owned retail stores, from October 1, 2019 to present, from Workday (2023 to present) and its predecessor HRIS PeopleSoft (prior to 2023), see the files provided at RFI 03, 04 - Workday and RFI 03, 04 - PeopleSoft. These spreadsheets do not contain department information because the same job title could appear in multiple departments.

4.      Provide a copy of the job description for each job position/title identified in 3(a).

**INITIAL RESPONSE:** See the Company's General Objections. Specifically, the Company objects to this request because it is overly broad, unduly burdensome, and seeks irrelevant

June 26, 2025
Page 6

information because it applies to all locations nationwide, regardless of whether they were Company owned, and regardless of their hiring activity, over a period of six years. The Company currently has over 20,000 employees nationwide, and the request is not limited to those positions where hiring occurred during the relevant period. Subject to and without waiving those objections, as explained in response to RFI 3, the Company is working diligently to identify if there is a report that includes the requested job title information, and it will supplement its response to this request accordingly as soon as possible.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, supplements its May 23 response by directing the agency to the spreadsheets it is producing in response to RFI No. 3 today, see the files provided at RFI 03, 04 - Workday and RFI 03, 04 - PeopleSoft. Those spreadsheets contain job profiles and descriptions extracted from Workday, and job posting titles and job posting descriptions extracted from PeopleSoft, where available, covering the period October 1, 2019 to present.

5.      During the relevant period, explain how Respondent notified employees of job vacancies and promotional opportunities.

**INITIAL RESPONSE:** See the Company's General Objections. Specifically, the Company objects to this request because it is overly broad, unduly burdensome, and seeks irrelevant information because it applies to all locations nationwide, regardless of whether they were Company owned, over a period of six years. In addition, the Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company. There are no allegations that the Company has engaged in any discrimination during the promotion process, so requests for such information are not relevant to this investigation. Subject to and without waiving those objections, see the Company's responses to RFI 6 below. The Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, confirms that its response remains the same when expanded to include the time period October 1, 2019 to the present.

6.      Provide documents describing the methods Respondent uses to advertise and recruit for open positions. Additionally, explain whether applicants are sought through referral from current employees and if so, describe the referral process and how it is documented internally.

**INITIAL RESPONSE:** See the Company's General Objections. Subject to and without waiving those objections, the Company advertises and recruits for open positions through a number of different sources internally, externally, online, and in-person.

The Company uses various means to recruit qualified candidates online. The Company posts job openings on its official Careers website (jobs.genpt.com). In addition, the Company partners with Radancy, a recruitment marketing firm, to distribute its job postings across various

June 26, 2025
Page 7

platforms on the internet, so the Company's job postings may appear on various online platforms like Indeed, LinkedIn, Glassdoor, ZipRecruiter, and Monster. The Company collaborates directly with LinkedIn and Indeed for paid promotion of its jobs on their respective platforms. The Company also uses social media, such as LinkedIn, for recruiting.

The Company seeks to leverage its existing employees to recruit qualified candidates. The Company has an employee referral program, and current employees are encouraged to recommend qualified candidates through incentives like bonuses or rewards. The Company is providing a copy of its Referral Program Policy at RFI 06. In addition, the Company leverages current employees' professional networks to tap into passive talent pools.

The Company works with third-party agencies or headhunters, as needed, to source specialized or hard-to-fill roles, particularly as part of the executive search process. The Company uses temporary staffing firms for short-term or project-based needs. See the Company's response to RFI 2.

The Company hosts and participates in various in-person and online recruiting fairs and events. For example, the Company attends college career fairs and organizes events to connect with recent graduates and interns. The Company also participates in on-campus recruitment events by partnering with universities to source talent for entry-level positions. The Company attends a variety of networking events, such as industry events, tradeshows, or associations, to build relationships with talent. In addition, the Company hosts its own job fairs, and attends other job fairs, to engage with candidates both in-person and virtually.

The Company uses its applicant tracking system for talent pipeline development, as a database of potential candidates for future openings. The Company reaches out to passive candidates via email, phone, or LinkedIn messaging to discuss potential opportunities, and also searches through results in online databases like LinkedIn and Indeed to find resumes that match job requirements.

The Company establishes partnerships with a variety of organizations and values community engagement as a recruitment source. For example, the Company partners with various local organizations and non-profits to increase visibility to qualified applicants, and engages with community groups to identify top talent. The Company also establishes partnerships with trade schools, professional organizations, and workforce development programs to source talent. As a federal contractor, the Company works with JobTarget to ensure OFCCP compliance by posting to government job boards and veterans' and disability-focused organizations, and the Company engages in targeted recruitment of qualified protected veterans and individuals with disabilities. The Company also works with local organizations, like the Shepard Center, to place qualified individuals with disabilities into open job roles.

The Company may accept resumes from walk-in applicants at its retail store locations, but all applicants are directed to apply online through Workday.

June 26, 2025
Page 8

The Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, supplements its May 23 response to state that prior to the Company's adoption of Workday on June 1, 2023, hiring managers were asked to direct all applicants to apply through Jobvite, which was the Company's former applicant tracking system (ATS). In addition, going back to October 1, 2019, not all Company owned retail locations had a referral program.

7. Describe in detail the hiring process for Respondent's job positions from October 1, 2019, through the relevant period. In responding, please include the following:

   a. A copy of any blank applications used during the relevant time period, as well as description of where and how a prospective applicant obtains and submits an application (including both in-person and online methods);
   b. The name and job position/title of all individuals to whom completed applications are submitted;
   c. A description of the factors used to determine whether an applicant is interviewed, a description of how the invitation to interview is communicated to an applicant and recorded internally, and the name and job position of all individuals that determine whether an applicant is interviewed;
   d. State whether applicant interviews are conducted in-store or by a corporate representative. Identify the job position/title of the individuals conducting the interviews, the job position/title of the person with final hiring authority, and whether such individuals work in-store or at the corporate level.
   e. A description of the factors used to determine whether an applicant receives a job offer, and the job position/title that determine whether an applicant receives a job offer, and how the decision is documented internally;
   f. A description of any post-offer steps (e.g., drug test, background check) that an applicant must complete before starting work; and
   g. Describe how applicants are notified that they have been offered or not offered a position.

**INITIAL RESPONSE:** See the Company's General Objections. Subject to and without waiving those objections, the Company's hiring process is focused on identifying candidates that possess the skills necessary to contribute to the team. Candidates can explore available opportunities through the Company's Careers webpage, where they will find detailed job descriptions and requirements. Applications are submitted online by completing an application form and attaching a resume, cover letter, or any other documents to support the candidate's qualifications. Prospective employees can obtain and submit an application by visiting https://jobs.genpt.com.

June 26, 2025
Page 9

The Company's recruitment team reviews applications to ensure candidates meet the qualifications and experience specific to the role. The following kinds of factors are used to determine whether an applicant is selected for an interview with a recruiter:

- **Relevant Skills and Experience:** Consideration is given to how closely the applicant's skills and experience align with the job description, including technical expertise and, where applicable, industry knowledge required for the role. Job descriptions and postings are regularly reviewed to ensure that the requirements are job-related and necessary for the role. As part of the Job Posting and Requisition review process, Hiring Managers collaborate with the People Partners to carefully review job descriptions. This ensures that the qualifications and requirements outlined are aligned with the specific responsibilities of the role.

- **Educational Background:** Preferred or required educational qualifications, as specified in the job description, are evaluated.

- **Work Experience:** Relevant years of work experience, as outlined in the job description, are assessed.

- **Location and Availability:** If specific location or availability requirements are defined as part of the job duties, these are reviewed for alignment.

- **Minimum Requirements:** The applicant must meet all minimum qualifications and requirements detailed in the job description.

- **Prescreening Evaluation:** Applicants are referred to hiring managers only if they meet all required qualifications and demonstrate suitability based on their responses to any prescreening questions designed to evaluate baseline compatibility with the role.

Applicants are invited to an interview by a Talent Acquisition Specialist or Talent Acquisition Coordinator based on the results of their initial prescreening. The individual responsible for determining whether an applicant is eligible for an interview is the assigned Talent Acquisition Specialist. This responsibility may also be fulfilled by employees holding the titles Talent Acquisition Manager, or Talent Acquisition Coordinator.

For in-store positions, interviews are not conducted at the corporate level. Instead, the following employees may be involved in interviewing candidates for in-store and sales roles: Talent Acquisition Specialists; Talent Acquisition Managers; Talent Acquisition Coordinators; Store Managers; Assistant Store Managers; District Managers.

Candidates may participate in an initial phone or virtual interview to discuss their background, experience, and interest in joining the Company. This stage may also include preliminary questions to assess knowledge relevant to the industry or profession of focus. For many roles, candidates are invited to an in-person or virtual interview with hiring managers or team leaders. Behavioral and situational questions may be used to assess problem-solving abilities, teamwork,

June 26, 2025
Page 10

and alignment with the Company's culture.  Candidates are assessed based on a set of core competencies and the Company's core values.

Final hiring authority for in-store roles rests with Store Leadership, which may include Store Managers, Assistant Store Managers, or District Managers.

If a candidate is selected for an offer, the Talent Acquisition Specialist will extend a verbal offer and notify the People Partner of the candidate's acceptance.  The People Partner will initiate the offer letter in Workday which outlines specific details such as position, salary, and other benefits.  Once the offer is signed, an Onboarding Coordinator will contact the candidate to initiate the required drug screening and background check process.

Upon successful completion of the drug screening and background check, the candidate will be contacted by a local People Partner to begin the onboarding process.

Please note that prior to Q2 2024, the Company's talent acquisition process was more decentralized, as hiring managers were responsible for owning all aspects of the talent acquisition process.  After Q2 2024, the Company centralized its recruiting function, shifting much of the responsibility from hiring managers to a team of assigned recruiters as described above.  Today, recruiters oversee the sourcing, screening, and recommendation of candidates who meet the job requirements.  Hiring managers are still involved in the later stages of the process, primarily through candidate review, in-person interviews, and providing feedback for final hiring decisions.

A copy of a current Workday application is attached at RFI 07.

The Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, confirms that the Company's May 23 response included information about the hiring process both before and after Q2 2024.  A sample application from the Company's former ATS Jobvite is being provided at RFI 07 Supplement.  The Company further supplements its May 23 response to state that, going back to October 1, 2019, some Company owned retail locations also worked with government agencies, such as the Employment Security Commission, that had programs to bring in unemployed or underemployed individuals to learn about the Company's business.  Some individuals who participated in these programs were subsequently hired, but they would have been required to go through the application process first.  In addition, from October 1, 2019 until the time of the COVID pandemic, the Company's recruiters would source candidates through various means and direct them to apply through the Company's internal job posting site, which automatically linked to the prior ATS Jobvite (there were two sites then, napaautojobs.com and jobs.genpt.com).

8.      Please explain at which step of the application process a person is considered a job

June 26, 2025
Page 11

applicant, how long an application is active, and whether a person may apply for a job when Respondent is not hiring.

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, an individual must complete and submit an application through the Company's applicant tracking system Workday to be considered an applicant.  Applicants are dispositioned during the application process, including once a requisition has been filled or closed.  The Company utilizes Evergreen requisitions to build a talent pipeline for certain positions.  The Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, confirms that its response remains the same when expanded to include the time period October 1, 2019 to the present; however, the Company did not use Evergreen requisitions when it used the Jobvite ATS.

9.      Please provide copies of documents which outline the Respondent's promotion procedures, protocols, guidance, instructions, handbooks, training materials or other documents that describe Respondent's application, hiring, interview, or promotion or selection policies or procedures. If informal procedures are used for internal promotions, please provide any documents that describe any policies or procedures that guide or regulate how those positions are filled.

**INITIAL RESPONSE:** See the Company's General Objections.  Specifically, the Company objects to this request because it seeks irrelevant information.  The Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company.  There are no allegations that the Company has engaged in any discrimination during the promotion process, so requests for such information are not relevant to this investigation

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

10.     Please provide copies of documents which outline the Respondent's hiring policies and procedures, protocols, guidance, instructions, handbooks, training materials or other documents that describe Respondent's application, hiring, interview, or hiring or selection policies or procedures. If informal procedures are used for hiring, please provide any documents that describe any policies or procedures that guide or regulate how those positions are filled.

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company incorporates Exhibit A (2023 Code of Conduct excerpts) and Exhibit B (Human Rights Policy), which were provided with the Company's Position Statement, as well as its response to RFI 16.  In addition, the Company has provided a copy of

June 26, 2025
Page 12

its Referral Program Policy in response to RFI 6.  The Company's response is limited to the period August 2, 2023 to present and to Company owned stores.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response and also incorporates its supplemental response to RFI 16.

11.     Describe Respondent's retention policies as they apply to application materials (e.g., applications, interview notes).

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company's retention policy states that it retains applications for individuals who were hired permanently and applications for individuals who were not hired for three years.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

12.     State Respondent's legal status (e.g., corporation, partnership, tax-exempt non-profit, etc.). If incorporated, identify the state of incorporation.

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company is a Georgia corporation.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

13.     Provide a complete organizational chart of your organization and organization's leadership. Additionally, identify each person's title, as well as their role in the organization's leadership structure.

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company does not maintain an official organizational chart.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

14.     Provide the name, title, and address of Respondent's Custodian(s) of Records.

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company does not have a Custodian of Records, but its Employee Service Center manages employee documents.  All correspondence regarding this matter, including records requests, should be directed to the Company's counsel at Ogletree Deakins.

June 26, 2025
Page 13

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

15.     Identify and explain in full the relationship between Genuine Auto Parts, and NAPA Auto Parts; Provide supporting documentation, if any.

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, Genuine Parts Company is the parent company of NAPA Auto Parts.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

16.     Submit copies of all written rules, policies and procedures in effect during the relevant time period relating to the following topics. If such does not exist in written form, provide a detailed explanation of the rules, policies, and procedures.

   a.     Race Discrimination
   b.     Equal Employment Opportunity in hiring and promotions.
   c.     Procedures for complaining about race discrimination, discriminatory hiring, and/or discriminatory promotion.

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, see Exhibit A (2023 Code of Conduct excerpts) and Exhibit B (Human Rights Policy), which were provided with the Company's Position Statement.  Additional responsive excerpts from the 2023 Code of Conduct, along with responsive sections of the 2023, 2024, and 2025 Employee Handbook and 2025 Code of Conduct are provided at RFI 16.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, the Company is providing excerpts from earlier versions of its Employee Handbook and Code of Conduct, see the files provided at RFI 16 Supplement.

17.     For the relevant time period, provide copies of all training, guidance, or instruction that Respondent's managers and/or employees have received from Respondent relating to the recruitment and/or hiring of in-store management and non-management employees. With respect to the training, provide the following:

   a.     Date of training;
   b.     Detailed description of audience trained;
   c.     Topics covered;
   d.     Names and titles of those who conducted the training and  copy  of CV/Resume; and,
   e.     Copies of training materials used and distributed during the training.

June 26, 2025
Page 14

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company does not offer trainings to employees or managers on the recruiting process, though the Company does publish job aids to assist with using the Workday system

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

18.    For the relevant time period, for each in-store management and non-management position, provide the pay rate and benefits offered, and all guidance/policies used to set salary or wage levels, bonuses or merit increases. Please also include documentation which reflects all benefits provided by Respondent for each position.

**INITIAL RESPONSE:** See the Company's General Objections.  Specifically, the Company objects to this request because it is overly broad and unduly burdensome.  The Company further objects to this request because it seeks irrelevant information.  The Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company.  There are no allegations that the Company has engaged in any form of discrimination involving compensation or benefits, so requests for such information are not relevant to this investigation.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

June 26, 2025
Page 15

## <u>SUPPLEMENTAL RESPONSES TO APRIL 10, 2025 RFI</u>

**SECTION I. Request for Description of Electronic Information**

1. For **each** system/software used during the investigative period of October 1, 2019, to present, please provide the following information:

    a. The name and version of the system/software and components.

    b. The date on which the company started using the relevant system/software. Name the predecessor system/software (if any) and dates used. (Note: If a software change occurred during the investigative period of October 1, 2019, to present, please continue to provide all descriptive items (a-h) for **each** system/software used during this period.)

    c. Estimate the number of records in the system/software.

    d. Estimate the number of applicants and employees in the system/software. (Note: The number of records is often different from the number of applicants or employees since systems/software often house more than one record of information per applicant or employee.)

    e. Describe the categories of any applicants and employees that have been excluded from the system/software.

    f. Produce the name and commonly understood description of **each** data field or variable on the system component(s) and indicate which data fields or variables are populated and utilized in the system. The "key variable" or unique identifier common to all components should be clearly defined. (Note: Please provide in an Excel or similar spreadsheet. PDF is not acceptable. If this information cannot be written into a comma delimited file (".csv"), a data base file (".dbf"), or other commonly used software (specifically, Excel, MS Access, dBase, SAS, STATA or SPSS), then provide file documentation, including file layout and field formats. That is, specify the beginning field and length of each variable, whether the variable is alpha or numeric, and the format of each variable, such as date formats or numeric formats indicating decimals or packed data.)

    g. Produce the definition of all codes used in the system/software identified in Part 1.f. above. (Note: Please provide in an Excel or similar spreadsheet. PDF is not acceptable.)

    h. Identify whether data can be exported from the system/software into an Excel or similar spreadsheet (for example, ".xls", ".xlsx", ".csv", ".dbf"). If data cannot be exported into an Excel or similar spreadsheet, indicate the file formats into which data can be exported.

    i. If the systems/software is maintained by an outside organization, please list the system/software with the name and address of the outside organization and the inclusive dates of the contract or arrangement. (*Note: In this instance, the Commission continues to request that you produce the descriptive items presented above (a-h).)*

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company uses Workday as its Human Resources Information System and Applicant Tracking System.  The Company started using Workday on June 1, 2023.  The system version is 2025.19, and the code version is 2025.19.1103.  There are over 380,000 U.S.

June 26, 2025
Page 16

applications and over 18,000 active U.S. employees stored in the Company's Workday system. Executive recruiting candidates have been excluded from the Workday system. Due to the high volume of information, data fields, and variables potentially available in the Workday system, the Company respectfully requests clarification from the agency about the type of information requested in subparts (c), (f), and (g). Data can be exported from Workday into Excel or a similar spreadsheet format. The Workday system is maintained in-house by the Company. The Company's responses are limited to the Company's U.S. operations, to the period August 2, 2023 to present, and to Company owned stores.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, supplements its May 23 response to confirm that its prior response provided the approximate number of unique applications, not the number of unique applicants, and the approximate number of unique employee IDs in the Workday system. In the file Section I RFI 1 - Workday Applicants, the Company is providing information extracted from the Workday system about the applicant data fields that are available in Workday. In the file Section I RFI 1 - Workday Codes, the Company is providing an extraction of the hiring codes that are available in Workday. The Company objects to the request for employee data systems information because it seeks irrelevant information. The Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company. Therefore, a request for employee data systems information is not relevant to this investigation.

The Company's predecessor HRIS was PeopleSoft. The system version was PeopleSoft 9.2. PeopleSoft was used for approximately 30 years until June 1, 2023, when Workday became the Company's HRIS. There were approximately 60,000 unique Company owned store employee records in the PeopleSoft system. The PeopleSoft system was maintained in-house by the Company. The Company is able to export data in .csv, .xls, and .xlsx. In the file Section I RFI 1 - PeopleSoft Codes, the Company is providing an extraction of the hiring codes that were available in PeopleSoft. The Company objects to the request for employee data systems information because it seeks irrelevant information. The Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company. Therefore, a request for employee data systems information is not relevant to this investigation.

The Company's predecessor ATS was Jobvite. The Company has not been able to identify the system version information, as Jobvite was decommissioned in December 2023. The Company began using Jobvite around September 2017, and it was used until June 1, 2023, when Workday became the Company's ATS. There were approximately 365,000 unique applicants for NAPA Store requisitions in Jobvite. Executive recruiting candidates were excluded from the Jobvite system. The Jobvite system was maintained in-house by the Company. The Company is able to export data in .csv, .xls, and .xlsx; however, the Company no longer has access to Jobvite and will only be able to provide data based on what was extracted. Attachments will be PDF or .txt format, depending on the format in which it was loaded. In the file Section I RFI 1 - Jobvite Applicants, the Company is providing information extracted from the Jobvite system about the applicant data fields that were available in Jobvite. The Company cannot access the Jobvite system codes, given that it no longer has access to the Jobvite system.

June 26, 2025
Page 17

**SECTION II. Additional Requests**

1. Produce an unredacted personnel file for one successful applicant for a non-managerial retail position. The personnel file should include copies or print screens of application materials, including results of interview and any pre-employment screenings. Each personnel file should represent an employee who was hired at Respondent on or after October 1, 2019.

**INITIAL RESPONSE:** See the Company's General Objections.  Specifically, the Company objects to this request because it seeks irrelevant information.  The Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company.  Therefore, a request for personnel file information of current employees is not relevant to this investigation.  Subject to and without waiving those objections, the Company is providing candidate information from its Workday system for an employee who was hired for a non-managerial position by the Company since August 2, 2023 at Section II RFI 1.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

2. Produce an unredacted copy of all application materials for one unsuccessful applicant for a non-managerial retail position. If hard copies of these documents do not exist, please provide screenshots from the Applicant Tracking System which stores this information. Results of interviews and any pre-employment screenings should be included. Each applicant file should represent an individual who applied to Respondent on or after October 1, 2019.

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company is providing candidate information for an unsuccessful non-managerial applicant since August 2, 2023 from its Workday system at Section II RFI 2.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

3. Produce an unredacted personnel file for one successful applicant for a managerial position. The personnel file should include copies or print screens of application materials, including results of interview and any pre-employment screenings. Each personnel file should represent an employee who was hired at Respondent on or after October 1, 2019.

**INITIAL RESPONSE:** See the Company's General Objections.  Specifically, the Company objects to this request because it seeks irrelevant information.  The Commissioner's Charge seeks to investigate allegations of race-based recruiting and hiring discrimination at the Company. Therefore, a request for personnel file information of current employees is not relevant to this investigation.  Subject to and without waiving those objections, the Company is providing

June 26, 2025
Page 18

candidate information from its Workday system for an employee who was hired for a managerial position by the Company since August 2, 2023 at Section II RFI 3.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

4. Produce an unredacted copy of all application materials for one unsuccessful applicant for a managerial position. If hard copies of these documents do not exist, please provide screenshots from the Applicant Tracking System which stores this information. Results of interviews and any pre-employment screenings should be included. Each applicant file should represent an individual who applied to Respondent on or after October 1, 2019.

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company is providing candidate information for an unsuccessful managerial applicant since August 2, 2023 from its Workday system at Section II RFI 4.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, restates its May 23 response.

**SECTION III. Request for a Description of Data-Driven Algorithms, Artificial Intelligence2 (AI), or Machine Learning Used for Recruitment, Screening, Selection, and/or Promotion**

1. Indicate whether Respondent uses algorithms, AI or other automated technology that rate, rank, or assess/test individuals that are used in any of Respondent's recruitment, screening, selection and promotion processes (hereafter "employment processes") such as rating or scoring applicants or employees

If yes, provide the following:
   a. Identify the dates for which the algorithms, AI or other automated technology system(s) were used by the Respondent and to the extent that the use has changed
   over time, include the dates of each change and describe what changes were made and why.
   b. Describe the purpose or objective(s) of the [algorithms, AI or other automated technology] system(s), including identifying each point in the process where it is used in the employment process or in decision-making.
   c. Identify which entity maintains the [algorithms, AI or other automated technology] system, e.g. the Respondent or Third-Party vendor.

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, the Company does not use any algorithms, AI, or other automated technology that rates, ranks, or assesses/tests individuals in any of the Company's recruitment, screening, and selection processes.

June 26, 2025
Page 19

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, confirms that its response remains the same when expanded to include the time period October 1, 2019 to the present.

2. For algorithms, AI or other automated technology maintained by Respondent, provide the names, titles, and mailing address, email address, and phone number of persons involved in the implementation, management, and oversight of the algorithms, AI or other automated technology system, including, but not limited to, those who create, supervise, maintain, or manage the system on behalf of Respondent. Describe the role each individual plays in this process.

**INITIAL RESPONSE:** See the Company's General Objections. Subject to and without waiving those objections, see the response to Section III, RFI 1.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, confirms that its response remains the same when expanded to include the time period October 1, 2019 to the present.

3. For algorithms, AI or other automated technology systems maintained by a third-party vendor or that was purchased from a technology vendor, provide the following:

> a. The entity name, the type of the algorithms, AI or other automated technology system used, mailing address, email address, phone number for the entity, and, the dates of the contract or arrangement.
> b. Describe the nature of the contract for the services and provide a copy of the contract.
> c. Provide the name, title, mailing address, email address, and phone number of each person at Respondent responsible for selection of, implementation, management, and oversight of the algorithms, AI or other automated technology system.

**INITIAL RESPONSE:** See the Company's General Objections. Subject to and without waiving those objections, see the response to Section III, RFI 1.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, confirms that its response remains the same when expanded to include the time period October 1, 2019 to the present.

4. Identify which decisions are made based (in whole or in part) on the outcome of the algorithms, AI or other automated technology system. Specifically:

> a. Describe the decision(s) made.
> b. Which employment decisions were based in whole or in part on the output of the AI or algorithmic technology system and give related dates for those decisions.,
> c. List all decision makers by name and job title, such as recruitment personnel, hiring managers, and supervisors, who used or whose employment decisions were informed by the algorithms, AI or other automated technology system.

June 26, 2025
Page 20

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, see the response to Section III, RFI 1.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, confirms that its response remains the same when expanded to include the time period October 1, 2019 to the present.

5. Provide a copy of all manuals, handbooks, or training materials on the algorithms, AI or other automated technology system(s) and/or its outputs developed by the third-party vendor, technology vendor, and/or Respondent.

**INITIAL RESPONSE:** See the Company's General Objections.  Subject to and without waiving those objections, see the response to Section III, RFI 1.

**SUPPLEMENTAL RESPONSE:** The Company incorporates its objections set forth in its Initial Response, and subject to and without waiving those objections, confirms that its response remains the same when expanded to include the time period October 1, 2019 to the present.

## CONCLUSION

We hope that these supplemental responses and supporting files and documents adequately address the issues raised in your June 5 letter.  As set forth in the Company's Position Statement, and as demonstrated by its May 23 responses and documents and today's supplemental responses, files, and documents, the Company does not discriminate against African-American candidates in recruiting and hiring.  We respectfully renew our request for a no probable cause finding.

Sincerely,

Erika L. Leonard

Cc:     Sheila Ward-Reyes
        Emily M. Halliday

# EXHIBIT 6

BEFORE THE UNITED STATES
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

IN THE MATTER OF:

GENUINE PARTS COMPANY d/b/a
NAPA AUTO PARTS,

          **Respondent.**

**Commissioner Charge No. 450-2024-07829**

**Subpoena No. DA-25-4**

**PETITIONER:**

Genuine Parts Company d/b/a NAPA Auto Parts

**BY:**

    Erika Leonard
    Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
    301 Congress Avenue, Suite 1150
    Austin, Texas 78701

**<u>DETERMINATION DENYING PETITION TO REVOKE OR MODIFY SUBPOENA</u>**

Genuine Parts Company d/b/a NAPA Auto Parts ("Company") has petitioned the U.S. Equal Employment Opportunity Commission ("EEOC" or "Commission") to revoke or modify Subpoena No. DA-25-4 ("Subpoena"), issued by the Commission's Dallas District Office. The Commission issues this determination pursuant to 29 C.F.R. § 1601.16. For the reasons set forth below, the petition is denied.

**BACKGROUND**

On May 2024, Commissioner Kalpana Kotagal filed a Commissioner Charge against the Company alleging that the Company failed to recruit or hire applicants on the basis of race (Black) in violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII), at its facilities nationwide from October 2019 to the present.

1

The Company received its first Request for Information (RFI) from the EEOC on April 3, 2025. Therein, the EEOC requested information about the Company's locations, recruitment firm and practices, job positions, pay scale, hiring processes, policies, and business organization nationwide for the period of October 1, 2019 to present. The Company received its second RFI from EEOC on April 10, 2025. Therein, EEOC requested information about the Company's applicant tracking system, human resource information system, and other software that the Company used to track information about applicants, as well as current and former employees, at all of the Company's locations nationwide for the period of October 1, 2019 to present.

On May 23, 2025, the Company provided a response to both RFIs. The Company objected generally that the Charge does not provide sufficient information about the allegations against the company and that any RFI extending beyond Title VII's 300-day charge-filing period is overly broad, unduly burdensome, and beyond the scope of EEOC's investigative and enforcement authority. The Company also lodged a number of specific objections to the April 3, 2025 requests, and to the extent it did not object, provided limited responsive information and a statement that it was searching diligently for additional responsive information. In response to the April 10, 2025 RFI, the Company identified Workday, Jobvite, and PeopleSoft as systems it used to track human resource information (i.e., relevant information concerning job applicants and/or employees) but sought clarification as to field data requested.

On June 5, 2025, EEOC sent a letter notifying the Company that its response was incomplete. It provided requested clarifying information to facilitate a complete response and set a deadline of June 26, 2025 by which the Company should supplement. It also explained the source of EEOC's authority to request information dating back to October 1, 2019 over the Company's objections.

The Company supplemented its responses on June 26, 2025. The Company's supplemental responses included requested information for the period of October 1, 2019 to the present, despite purporting to maintain an objection to producing documents dated beyond the 300-day charge-filing period. It provided location information restricted to only Company-owned retail stores and excluded information about Company-owned distribution centers and heavy-duty stores. The Company provided a redacted contract for one recruitment firm, no contract for another named recruitment firm, and no recruitment firm information pre-dating August 2, 2023. In response to a request for copies of training, guidance, or instruction for employees related to recruitment and hiring, the Company indicated managers use job aids without providing copies of those job aids. The Company objected to requests for information about pay rates and benefits offered and provided no responsive information.

On July 30, 2025, in connection with its investigation into the Charge, the Commission issued the Subpoena, which was served by certified mail on the Company's agent. Part A of the EEOC's subpoena requests:

1) business locations operated by the Company;

2) the positions available at those locations;

3) copies of job aids to assist employees with using Workday;

4) recruiting contracts with Randstad SourceRight;

5) recruiting contracts with Handler Executive;

6) hiring policies and procedures;

7) pay rate and benefits for each position available in the Company's locations;

8) complaints of discrimination; and

9) analyses of the racial or national origin composition of the Company's workforce.

3

Part B of the subpoena requests:

A) Workday data contained in specified data fields for the period October 1, 2019 to present;

B) Jobvite data contained in specified data fields for the period October 1, 2019 to present;

C) PeopleSoft data contained in specified data fields for the period October 1, 2019 to present; and

D) name of the preparer of the Company's response.

On August 7, 2025, the Company submitted its Responses, Objections, and Requests for Modification and its Petition to Revoke or Modify the Subpoena. The Petition to Revoke or Modify argues that the Subpoena requests information not reasonably related to the Commissioner Charge, the Subpoena is overly broad in scope, responding to the Subpoena would be unduly burdensome, and that the Subpoena should be revoked because it requests information the Company did not first refuse to provide. In the alternative, the Company requests that EEOC modify the subpoena to narrow its scope.

Despite the breadth of relief requested in the Petition, the Company agrees in its Responses, Objections, and Requests for Modification to supplement its response to provide the information requested in Subpoena Part A, requests 1–6. The Company agrees to "review whether non-privileged, responsive documents exist" in response to request 9, but the temporal scope of the intended production is not clear. The Company stands on its objections with respect to Subpoena Part A, requests 7 and 8. It also stands on its objections to producing Workday data before June 1, 2023 for applicants and employees hired prior to that date as requested in Subpoena Part B, request A. Similarly, the Company states it will not produce any Jobvite or PeopleSoft data in response to

4

requests B and C. The Company states an intent to respond to Subpoena Part B, request D but does not do so.

**ANALYSIS**

**I.    EEOC requests only information that would cast light the Charge being investigated.**

The Commission possesses statutory authority to issue subpoenas in connection with an investigation. *E.g.*, 42 U.S.C. § 2000e-9 (granting EEOC the same investigative powers possessed by the National Labor Relations Board under 29 U.S.C. § 161). Title VII expressly provides that EEOC "shall at all reasonable times have access to, for the purposes of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this subchapter and is relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a). The relevance standard applicable to the foregoing investigative authority is broad and includes "virtually any evidence that might cast light on the allegations." *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68–69 (1984). Since the enactment of Title VII, courts have generously construed the term "relevant" and have afforded EEOC access to virtually any material that might cast light on the allegations against the employer. *E.g.*, *EEOC v. Technocrest Sys., Inc.*, 448 F.3d 1035, 1038–39 (8th Cir. 2006) (citing *Shell Oil*, 466 U.S. at 68-69). The concept of relevancy in this investigative context is not especially constraining. *Id.* All information requested from the Company in the Subpoena falls squarely within the Commission's authority.

*A.  Demographic information requested by Subpoena Part B, A-C is relevant.*

The Commission seeks only information relevant to the charge allegation that the Company violated Title VII by failing to recruit and hire Black applicants nationwide based on their race. Although the Company asserts that the demographic information requested by Subpoena Part B,

5

A-C is irrelevant to the Charge, its argument is meritless. Requests A, B, and C of the EEOC's Subpoena Part B seek information on job applicant and employee qualifications and demographics that is maintained in the Company's Human Resource Management system databases. This information casts light on the crux of the Charge. Race data shows the number of Black employees as compared to Black job applicants and the rate at which the Company hires Black job applicants compared to non-Black job applicants. Such information is not only relevant, but highly probative of whether there is reasonable cause to believe that the Company has engaged in race discrimination in hiring. Other demographic information such as birth dates and Gender (Respondent's nomenclature for the sex of the workers in question) are relevant identifying characteristics that, among other uses, enable EEOC personnel to distinguish between individuals in a data set bearing the same names and to obtain current contact information when the contact information that the Company produces to EEOC is outdated, which is a frequent occurrence.

The Company also objects to EEOC's request for system data fields in Subpoena Part B requests A-C, including "Termination Date," "Termination Reason," and "Position History," claiming they are irrelevant to a discriminatory hiring charge. However, this is relevant information. "The EEOC is entitled to information that 'may provide a useful context' for evaluating employment practices under investigation, in particular when such information constitutes comparison data." *EEOC v. Kronos, Inc.*, 620 F. 3d 287, 298 (3d. Cir. 2010) (quoting *EEOC v. Univ. of Pittsburgh*, 643 F.2d 983, 985–86 (3d. Cir. 1981)). This information shows career progression of job applicants who are hired, including but not limited to how long applicants remain in entry-level positions, the tenure of employees at the Company, and whether there are racial disparities in those aspects of employment, which certainly sheds light on both the presence or absence of invidious motivation in hiring decisions as well as remedial questions such as back

6

pay for any workers denied employment because of race. These data fields also provide information relevant to examine the motivation for hiring decisions by the Company where job applicants are incumbent employees or former employees.

Further, knowing whether individuals are current or former employees and when they left the Company's employment may bear on EEOC's decision to contact certain individuals during the investigation. EEOC possesses legal authority to directly contact employee witnesses who may have relevant information, but the agency considers present role within the organization and employment status in doing so. *See* EEOC Compliance Manual § 23.6(c). Accordingly, the information requested in Subpoena Part B, A-C is both substantively relevant to determining whether the Company violated Title VII and useful for determining scope of witness interviews and logistics to be used when scheduling and conducting such interviews.

   B. *Pay rate and benefit information requested in Subpoena Part A request 7 is relevant.*

The Company argues the pay rate and benefits information requested in Subpoena Part A, request 7 is irrelevant to the Charge. However, pay rate and benefit information is relevant evidence in Title VII failure to hire investigations as it allows EEOC to evaluate whether Black job applicants, when they are hired, are placed into inferior positions, i.e., lower-paying jobs with fewer benefits, than other applicants. It is well established that channeling of job applicants into lower paid positions because of their race is a discriminatory *hiring* practice that violates Title VII. *See Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 618 (5th Cir. 1983) (affirming the district court's holding that the defendant impermissibly "channeled" black and female applicants into lower paying jobs).

Additionally, should the Commission find a violation, Title VII obligates it to engage in the conciliation process, during which it attempts secure an informal resolution in the public

7

interest before resorting to litigation. 42 U.S.C. § 2000e-5; *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015). Back pay is the appropriate remedy for discriminatory denial of hire under Title VII. *See, e.g.*, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 412 (1975). Therefore, information about pay and benefits is relevant to the allegations in the Charge, and the Act leaves to the Commission's sole discretion the timing of its decision to seek evidence relevant to remedies. The Commission has exercised that discretion here. Accordingly, Subpoena Part A request 7 requires production of relevant information.

### C. Identification of Company-owned locations requested in Subpoena Part A, requests 1– 2 is relevant.

The Company's concern as stated in response to Subpoena A, requests 1–2 that EEOC seeks information about franchises or locations that are not company-owned or operated is unfounded. EEOC's request that the Company's response "should include, but is not limited to, company-owned retail stores and distribution centers" clarified the scope of EEOC's previous requests for information about "all of Respondent's locations nationwide." It limits the request to company-owned locations but clarifies that "locations" is not limited to sales locations, as the Company assumed in its initial response to EEOC's April 3, 2025 RFI. Rather, the requests are directed at all types of company-owned locations. As the Company has agreed to provide information in response to Subpoena A, requests 1–2 about Company-owned distribution centers and heavy-duty stores, EEOC believes this objection to be resolved pending receipt of responsive information.

### D. Subpoena Part A, request 8 for information regarding complaints of discrimination is relevant.

Defendant objects to EEOC's Subpoena Part A, request 8, which requires production of information regarding complaints of discrimination by the Company's applicants or employees on the basis of race, national origin, or color, on the basis that it seeks irrelevant information.

However, even under the narrower concept of relevancy applicable to civil discovery, the federal courts routinely compel production of evidence of discrimination complaints in Title VII discrimination cases, even where the request is for complaints by individuals who are not themselves the subject of litigation. *See, e.g.*, *Williams v. U.S. Env't Servs., LLC*, No. CV 15-168-RLB, 2016 WL 617447, at *8 (M.D. La. Feb. 16, 2016) (ordering defendant to produce evidence of any complaints of harassment or discrimination); *Kleppinger v. Tex. Dep't of Transp.*, No. CV L-10-124, 2012 WL 12893655, at *5 (S.D. Tex. Sept. 30, 2012) (granting motion to compel production of evidence of other employee complaints of harassment or discrimination); *Beasley v. First Am. Real Est. Info. Servs., Inc.*, No. 3-04-CV-1059-B, 2005 WL 1017818, at *1 (N.D. Tex. Apr. 27, 2005) (compelling defendant to produce evidence of other employee complaints of harassment or discrimination for years after the violation alleged). Such complaints are relevant because Title VII plaintiffs bear the burden to show discriminatory intent. *See*, *e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). It is well established that discrimination against other individuals on the same basis as a plaintiff alleging discrimination is relevant to, and probative of, the employer's intent or motive in actions taken against the plaintiff. *See, e.g., Alaniz v. Zamora-Quezada*, 591 F.3d 761, 774-75 & n.34 (5th Cir. 2009) (citing <u>Hitt v. Connell, 301 F.3d 240, 249-50</u> (5th Cir. 2002)). Although Petitioner objects to the relevance of employee complaints to a charge alleging recruiting and hiring discrimination, complaints by employees are at least as probative of intent as those by job applicants, as they may either directly relate in whole or in part to recruitment and hiring activities, may pertain to the motivation of managers or other personnel who carry out such activities as part of their job duties, may indicate a condoned atmosphere of invidious discrimination within an organization, or may otherwise be probative of potential

discrimination in one setting that gives rise to an inference of bias in a different setting. *See, e.g., id.* at 774 n.30 (citing *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1324-25 (11th Cir. 2000)).

The Subpoena permissibly includes complaints of national origin and color discrimination. "[I]n the Title VII context, the terms [race and national origin] overlap as a legal matter." *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (The "line between discrimination based on 'ancestry or ethnic characteristics' and discrimination based on 'place or nation of origin,' is not a bright one."); *Bullard v. OMI Georgia, Inc.*, 640 F.2d 632, 634 (5th Cir. 1981) ("In some contexts, national origin discrimination is so closely related to racial discrimination as to be indistinguishable."); EEOC Compliance Manual § 13-II ("National origin discrimination often overlaps with race, color, or religious discrimination . . ."). The overlap between race, color, and national origin discrimination necessitates a broader request for employee and applicant complaints. *See Bullard*, 640 F.2d at 634; *Odeh v. City of Baton Rouge*, No. CV 14-793-JJB-RLB, 2016 WL 1254361, at *2 (M.D. La. Mar. 29, 2016). In sum, the Commission properly requests only information that casts light on the Charge allegations.

> E. *Studies or analyses related to the racial or national origin composition of the Company's applicants, hires, or employees requested in Subpoena Part A request 9 are relevant.*

Analyses of the racial or national origin composition of the Company's applicants, hires, or employees, including any analysis of whether the Company has underrepresentation of job applicants or employees based on race or national origin are squarely relevant to the Charge. Data, or an analysis of data, showing the number of Black employees, applicants, and hires as compared to non-Black comparators is the foundation of a determination of whether there is reasonable cause to find that the Company failed to hire Black applicants in violation of Title VII.

## II.    The temporal scope of the charge is appropriate.

The Subpoena requests information related to the Company's nationwide selection decisions and hiring process for all management and non-management positions at Company-owned locations since October 1, 2019. In its Petition to Revoke or Modify, the Company challenges the Subpoena on the basis that the temporal scope of the information requested is overly broad and argues it is obliged to provide data dating back only to August 2, 2023. While Defendant has either produced or stated an intent to produce information within the full scope of EEOC's request in response to several requests, it stands on its temporal scope objection with respect to Subpoena Part A, requests 7 and 8 and Subpoena Part B, requests A-C. The extent to which it intends to comply to Subpoena Part A, request 9 is unclear.

The temporal scope of the Subpoena is tailored to the allegations in the Commissioner Charge, and for that reason, the Commission inarguably has authority under Title VII to access the requested materials. *See, e.g.*, *EEOC v. McCormick & Schmick's*, No. 07-cv-80065, 2007 WL 1430004, at *5–8 (N.D. Cal. May 15, 2007) (discussing relationship between materials requested in Commission administrative subpoena and allegations in Commissioner Charge).

Because Petitioner cannot contend that the temporal scope of the Subpoena exceeds the temporal scope of the allegations in the Commissioner Charge—they are exactly the same— Petitioner argues that every instance of possible race discrimination in hiring and recruitment that may have preceded the Commissioner Charge by more than 300 days is categorically irrelevant because, purportedly, those incidents cannot be the subject of claimant-specific relief.

Petitioner's relevancy argument, which is predicated on an attempt to assert a statute of limitations-type defense, is incorrect as a matter of law. As has been observed by the federal courts in another, salient context, "'The statute of limitations is a defense . . . , not a rule of evidence.

11

Therefore, . . . [it] has no bearing on the admissibility of evidence.'" *Black L. Enf't Officers Ass'n v. City of Akron*, 824 F.2d 475, 483 (6th Cir. 1987) (quoting *United States v. Ashdown*, 509 F.2d 793, 798 (5th Cir. 1975)). Particularly, but not exclusively, in the context of pattern or practice allegations, background facts showing statistical patterns or other discriminatory conduct, even if not independently actionable, are relevant to, and potentially highly probative of, the existence of discrimination within the actionable violation period. *See, e.g.*, *Walker v. Jefferson Cnty. Home*, 726 F.2d 1554, 1557 (11th Cir. 1984) ("[T]he court clearly may consider evidence of prior discriminatory acts if such evidence is relevant to show independently actionable conduct occurring within the statutory period."); *Fisher v. Proctor & Gamble Mfg. Co.*, 613 F.2d 527, 540 & n.25 (5th Cir. 1980) (holding evidence of acts of discrimination pre-dating liability period by four to five years relevant and admissible to prove discrimination within liability period) (citing United Air Lines, Inc. v. Evans, 431 U.S. 553 (1977)).

Simply put, the scope of relevant evidence and the scope of potential remedies are not legally or logically co-extensive, and there is therefore no basis to preclude the production and analysis of data and other evidence pre-dating the charge-fling period in this matter. Whether the Company is potentially liable for discrimination occurring 300 days before the charge is irrelevant to EEOC's authority to seek information during an administrative investigation prior to 300 days before the charge.[1] As discussed above, the applicable relevance test applied to EEOC investigations is broad, and systemic investigations of allegedly discriminatory hiring practices necessarily require broad data sets, as they are typically proven using statistical models. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977) (emphasizing the importance of statistical evidence in proving discrimination cases). EEOC must gather sufficient data to create a

---

[1] The Commission declines to address the question of the scope of claimant-specific relief that it may seek under Title VII here because it is immaterial to the issue of the Commission's authority to obtain the relevant evidence in question.

reliable statistical model, as well as examine the experiences of workers over time. An EEOC subpoena that seeks information within four to five years of the filing of the charge under investigation is generally considered to be appropriate in temporal scope and not overbroad, particularly where the subject of the investigation is a broad policy or practice or where context is otherwise salient.  *See, e.g.*, *EEOC v. Randstad*, 685 F.3d 433, 450-51 (4th Cir. 2012) (holding five-year temporal scope after charging party termination relevant); *EEOC v. Roadway Exp., Inc.*, 261 F.3d 634, 642 (6th Cir. 2001) ("[I]t is not uncommon for the EEOC to receive information concerning events that took place up to three or four years before the date when the discrimination allegedly took place."); *EEOC v. Quantum Foods, LLC*, No. 09C7741, 2010 WL 1693054, at *5 (N.D. Ill. Apr. 26, 2010) (four years); *EEOC v. New Prime, Inc.*, No. 02-3072-CV-S-3-ECF, 2002 WL 1377789, at *3 (W.D. Mo. May 28, 2002) (five years before alleged discrimination).

 In sum, the temporal scope of the Subpoena is appropriate and will not be modified.

**III.     The Subpoena is not unduly burdensome.**

The Subpoena does not subject the Company to undue burden. A Commission subpoena will be enforced unless a respondent demonstrates that compliance "would threaten the normal operation of a Respondent's business." *EEOC v. Bay Shipbuilding Corp.*, 668 F.2d 304, 313 (7th Cir. 1981); *EEOC v. All. Residential Co.*, 866 F. Supp. 2d 636, 644 (W.D. Tex. 2011). The Company argues that it is burdened by the number of data fields requested and by the number of applicants and employees whose information the EEOC requests. However, the EEOC's request is tailored to the reporting capabilities of the Company's Human Resource Management software, Workday, Jobvite, and Peoplesoft. All three systems permit the Company to run searches and generate reports based on user specifications. The resources necessary to generate a report with five data fields are exactly the same as the resources necessary to generate a report with five-

hundred data fields. The same is true with respect to the number of individuals subject to search. Although the Company alleges these searches would be time consuming and expensive, it does not identify the source or quantum of the expenses or why it believes using the report functions will be time intensive. Petitioner is required to make a particularized showing of undue burden, and conclusory allegations of burdensomeness do not support revoking a subpoena. *See, e.g., EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 653 (7th Cir. 2002); *EEOC v. Citicorp Diners Club, Inc.*, 985 F.2d 1036, 1040 (10th Cir. 1993); *EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 477 (4th Cir. 1986).  The Company has not shown there is the requisite level of burden imposed by the Commission's request that the Company search its databases.

Next, the Company argues it cannot comply it because "it cannot access the Jobvite system codes, given that it no longer has access to the Jobvite system." Whether a company must produce information held by a legacy system is subject to the question of whether it retains custody or control over the information. *Cf.* Fed. R. Civ. P. 34(a)(1). Although the Company may not have current custody of information held in legacy systems, it does retain legal control if it has the "right, authority, or practical ability to obtain the information from a non-party. . . ." *See EEOC v. MVM, Inc.*, No. CV TDC-17-2881, 2020 WL 6482193, at *2 (D. Md. Nov. 2, 2020). Failure to obtain or preserve third-party information after a charge of discrimination is filed with the EEOC, thereby providing the company notice in reasonable anticipation of litigation, is sanctionable. *Id*. at *2. Here, the Company has not provided any reason why it does not have the right, authority, or practical ability to obtain its records from Jobvite and there is no undue burden created by the mere fact that the requested information is held by a third party.

Finally, the Company expresses concern that Subpoena Part A, requests 6 and 8 would require the Company to make individual inquiries to determine whether responsive information

14

exists. With respect to request 6, the Company expresses concern it must ask whether each employee has received any informal or individualized guidance or instructions with respect to hiring. With respect to request 8, it objects to inquiring at thousands of locations as to whether they have received any informal complaints of race discrimination. This is not an accurate characterization of the requests and the EEOC has no such expectation. Request 6 clearly states it is a request for formal and informal documents describing the Company's hiring processes. It is not unduly burdensome for the Company to identify its own policy documents. Similarly, it is not burdensome to review information management systems such as Jobvite, PeopleSoft, or Workday for recorded complaints. To the extent the Company's processes necessitate local level inquiry, contemporary technology facilitates distributing standardized reporting forms electronically via a mailing list.  As the Subpoena does not threaten the normal operation the Company's business, it need not be revoked.

## IV.    The Subpoena was issued pursuant to a valid Commissioner Charge.

Petitioner objects that the Subpoena is invalid because the Commissioner Charge that is the subject of this proceeding is itself invalid, purportedly because the charge allegations are insufficiently detailed. Petitioner's argument is meritless.  The subject Commissioner Charge meets all statutory charge filing requirements and satisfies the standard set by the Supreme Court in *EEOC v. Shell Oil Co.*, 466 U.S. 54 (1984), and it is therefore valid.

Under Title VII, a charge of discrimination must include a clear and concise statement of the facts, including the pertinent dates, constituting the alleged unlawful employment practices. 42 U.S.C. § 2000-e5; 29 C.F.R. § 1601.12(a)(3). In that regard, a Commissioner charge should state the following information:

> the groups of persons that [the EEOC Commissioner] has reason to believe have been discriminated against, the categories of employment positions from which they have been excluded, the methods by which the discrimination may have been

15

effected, and the periods of time in which he suspects the discrimination to have been practiced.

*EEOC v. Shell Oil Co.*, 466 U.S. 54, 73 (1984).

The Commissioner Charge in this proceeding satisfies all of the requirements of *Shell Oil*, as it affirmatively sets forth each of the following: (1) it identifies "Black candidates" for employment by the Company as the group of persons who have been excluded; (2) it is not limited to specific positions, instead stating the discrimination has affected "Black candidates" generally and occurred on a "nationwide basis[,]" which is properly understood as, and which Petitioner itself understands to mean, an allegation concerning *all* categories of position; (3) it lists both "[f]ailure to recruit" and "[f]ailure to hire" as the methods of discrimination; and (4) it specifies the time frame of October 2019 to the present. "[A] charge of employment discrimination is not the equivalent of a complaint initiating a lawsuit. The function of the charge, rather, is to place *the EEOC* on notice that someone . . . believes that an employer has violated the [Act]." *EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1089 (5th Cir. 1987) (quoting *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68 (1984) (emphasis added)). The foregoing allegations are sufficient to satisfy statutory charge content requirements, consistent with the purpose served by an administrative charge of discrimination.[2]  Therefore, revocation of the Subpoena is unwarranted.

## V.     A Commission subpoena may encompass evidence that was not previously requested by informal means.

The Company objects to Subpoena Part A, requests 1, 2, 4, 5, 7, 8, 9 and to all Subpoena Part B requests on the basis that they are improper because they are either broader in scope than

---

[2]  Additionally, the Commission notes the well-settled principle of law in this area that a subpoena's validity or enforceability does not turn on the merits of the allegations reflected in the underlying charge. *E.g., Shell Oil Co.*, 466 U.S. at 72, n.26. Because there is no requirement that the charge be "well-founded" or "verifiable" in order for the Commissioner Charge to be valid under the *Shell Oil* test, *id.*, Petitioner's argument predicated on speculation about facts or evidence that may have precipitated the charge is immaterial.

16

the Commission's RFIs or requests made for the first time. Over its objection, the Company agrees to respond to Subpoena Part A, requests 1–6 and 9 and Subpoena Part B, request A. EEOC denies all requests to revoke or modify the Subpoena on the basis that it does not have the authority to request information not previously subject to an RFI.

The EEOC is not constrained to issuing subpoenas only after a company has refused to provide requested information. Section 709(a) of Title VII imbues the Commission with the authority to serve subpoenas to gain access to "any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this subchapter and is relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a). Section 710 of Title VII incorporates § 11 of the National Labor Relations Act (NLRA), 29 U.S.C. § 161, and confers on the Commission the same subpoena powers the NLRA gives to the National Labor Relations Board. 42 U.S.C. § 2000e-9. None of these statutory provisions require exhaustion of preliminary investigative methods, such as an informal request for information, before the Commission may issue a subpoena. Similarly, the Code of Federal Regulations places no limitation on when or under what circumstances the EEOC may elect to obtain information by the issuance of a subpoena. *See* 29 C.F.R. § 1601.16. The absence of the precondition asserted by Petitioner in the relevant statutory or regulatory text is dispositive.

Though not controlling, the Commission also notes that the EEOC Compliance Manual, cited by the Company in its Petition, does not support its position. The Commission "[o]*rdinarily* use[s] subpoenas only after other investigative methods have been attempted." EEOC Compliance Manual § 24.1 (emphasis added). And in that regard, Compliance Manual states that the Commission does not consider its failure to comply with the Manual's procedures, when those procedures are not statutorily required, to be a basis for revoking a subpoena. EEOC Compliance

17

Manual § 24.12 ("The procedures in § 24 are for EEOC staff use and lack of adherence to any procedures herein, not mandated by statute, is not grounds for an appeal."). The Compliance Manual further states that alternative investigative methods are not required before the issuance of a subpoena "when there is a reasonable basis to conclude that the respondent will resist the investigation." *Id.* § 24.4(d). The Commission has already sought voluntary compliance through RFIs and not obtained it, indicating a likelihood that future requests would also end in enforcement action.

Once the Company failed to comply with an EEOC investigator's RFI, it is appropriate for agency investigative staff to seek further information through utilization of an administrative subpoena and such administrative subpoenas need not "mirror" RFIs that have preceded them. Nor does the Commission need to wait idly for the Company to provide information it has promised but not produced or for the Company to refuse to provide additional information that might result in the need for a second subpoena.

**CONCLUSION AND DETERMINATION**

For the foregoing reasons, the Company's objections are without merit. Accordingly, Petitioner's Petition to Revoke or Modify Subpoena No. DA-25-4 is hereby DENIED.

Petitioner is hereby DIRECTED to comply with the Subpoena and produce all responsive materials within 21 days of its receipt of this Determination.

The subject Subpoena specifies instructions for file format and transfer to Commission custody of information contained in Petitioner's data systems that are the subjects of Attachment B to the Subpoena. As has become standard practice regarding electronically stored information ("ESI") production, in the event that the Commission's instructions for formatting and transfer of the data responsive to Attachment B are deemed infeasible, or if there are ESI that are responsive

18

to Attachment A to the Subpoena, Petitioner should confer with the assigned Commission personnel before production to ensure that the form and method of transfer of any required ESI production is consistent with the Commission's investigative needs. Such conferral will avoid unnecessary delay or burden for all involved and should prevent the need for duplicative production that would be caused by ESI forms that are not reasonably useable. EEOC Investigator Jonathon Harris can be reached via email at jonathon.harris@eeoc.gov.

ON BEHALF OF THE COMMISSION:

Thomas M. Colclough, Director, OFP

Digitally signed by Thomas M. Colclough, Director, OFP
DN: cn=Thomas M. Colclough, Director, OFP, o=EEOC, ou=Office of Field Programs (OFP), email=thomas.colclough@eeoc.gov, c=US
Date: 2025.09.30 15:35:04 -04'00'

DATED:  September 30, 2025

Thomas M. Colclough
Director, Office of Field Programs

# EXHIBIT 7

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Dallas District Office**
207 S. Houston Street 3rd Floor

Dallas, TX 75202
(800) 669-4000

Website: www.eeoc.gov

08/20/2025

GENUINE PARTS COMPANY
2999 WILDWOOD PKWY

Atlanta, GA 30339, UNITED STATES OF AMERICA

**Via Respondent Portal.**

Re:    Kalpana Kotagal v. GENUINE PARTS COMPANY
EEOC Charge No.: 450-2024-07829

Respondent is hereby requested to submit the following information and records relevant to the subject charge of discrimination. The Commission is required by law to investigate charges filed with it, and this request constitutes a part of the investigation. Failure to respond by the identified deadline could result in the issuance of a subpoena, pursuant to the laws that we enforce, or an adverse inference finding of discrimination against the Respondent.

This request for information does **not** necessarily represent the entire body of evidence which the EEOC needs to obtain during the investigation. You are reminded to preserve all documents[1], applications, applicant flow logs, new hire kits, personnel files, personnel records and electronic records relevant to this action until final disposition. Any and all information related to this Request for Information, including any and all documents[1] and emails related in any way, are considered relevant and must be preserved under the EEOC's record-keeping regulations. The information will only be disclosed in accordance with 29 C.F.R. 1601.22, or otherwise made public if the matter results in litigation.

If your organization wishes to submit additional evidence which you believe will more fully support your position, please submit this evidence along with the attached requested information on or before: **09/04/2025**

Thank you in advance for your prompt attention to this request. If you have any questions, you may contact the assigned staff person listed in the Portal.

The following dates are considered the relevant period for this Request for Information:

---

[1] The term "**document**" used in this Request for Information is used in its broadest sense and means the complete original or a true, correct and complete copy and any non-identical copies (whether different from the original because of notes or comments made on or attached to such copy or otherwise) of any written, graphic, typed, printed, filmed, recorded or electronic information, published or unpublished, no matter how produced, recorded, stored, or reproduced (including computer stored or generated data, together with instructions or programs necessary to search and retrieve such data), including, without limitation, any writing, letter, telegram, memorandum, note, electronic mail or message, telephone message, telephone or toll call record, statement, book, handbook, appointment book, calendar, minutes or record of meetings, report, manual, study, analysis, summary, log, digest, record, bill, statement, voucher, working paper, chart, graph, table, drawing, photograph, videotape, audio recording (including telephone answering machine messages), diary, tabulation, data sheet, directive, standard, pamphlet, brochure, circular, advertisement, announcement, application, list, permit, survey, punch card, witness statement, note of interview or communication or any other data compilation in the possession, custody, or control of Respondent, including all drafts of such documents.

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Dallas District Office**
207 S. Houston Street 3rd Floor

Dallas, TX 75202
(800) 669-4000

Website:  www.eeoc.gov

**10/01/2019 - 08/20/2025**

## U.S. Equal Employment Opportunity Commission
## REQUEST FOR INFORMATION

**Charging Party:** Kalpana Kotagal
**Respondent:** GENUINE PARTS COMPANY
**Charge No.:** 450-2024-07829

Provide an interview date and time for Arianne Reeves who is, upon information and belief, a Human Resources Manager in Tampa, Florida.

Provide additional interview times and dates for at least one individual with each of the following job titles:

1.    Talent Acquisition Specialist

2.    People Partner

Additionally, Respondent must designate one or more officers, agents, or other person consenting to be interviewed on Respondent's behalf regarding the matters set forth below:

Defendants' policies, practices, and procedures for the time period of October 2019 to the present regarding the recruitment and hiring of job applicants for all managerial and non-managerial positions in company-owned retail stores and distribution centers. Without limitation, areas of inquiry may include:

1. content of such policies, practices and procedures, whether written or unwritten;

2. dates such policies, practices and procedures were in effect;

3. purposes for such policies, practices, and procedures;

4. the process of designing and approving such policies, practices, and procedures;

5. identity and nature of roles of persons involved in designing, approving and/or implementing such policies, practices, and procedures;

6. and all data systems used to compile and/or store information related to the application process.

For each interview, please identify three dates and times prior to October 15, 2025. Please exclude September 1-5, September 28 – October 3, 2025. At least 3 days before the agreed upon interview date, please notify the EEOC of the identity of the individuals to be interviewed.

If your organization wishes to submit additional evidence which you believe will support your position, please submit this evidence along with the requested information/documentation.

If we do not receive your response, the Commission may subpoena the information pursuant to the Commission's Procedural Regulations (29 C.F.R. 1601.16). Alternatively, if you fail to respond as instructed herein, the Commission can infer that your refusal to provide a substantive response is detrimental to Respondent's position. Therefore, the Commission may draw an adverse inference against Respondent as to the information sought.

The information will only be disclosed in accordance with 29 C.F.R. 1601.22, or otherwise made public if the charge results in litigation.

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | § § § | |
| Petitioner, | § § | |
| | § | CIVIL ACTION NO. |
| v. | § | 3:26-MC-009-N-BW |
| | § | |
| GENUINE PARTS COMPANY d/b/a NAPA Auto Parts, | § § | |
| | § | |
| Respondent. | § | |

## DECLARATION OF KRISTINE REID

1.  I, Kristine Reid, am over the age of 18 and competent to make this declaration. I am making this declaration pursuant to the provisions of 28 U.S.C. § 1746.

2.  I have been employed by Genuine Parts Company ("Genuine Parts" or "the Company") in various Human Resources capacities for NAPA Auto Parts ("NAPA") for more than 14 years. Genuine Parts Company is the parent company of NAPA Auto Parts. I have been People Director for NAPA since 2019. I currently have responsibility for all employees in company-owned stores in the NAPA Mid-South Region; I previously had responsibility for employees in NAPA distribution centers.

3.  I understand this matter concerns a subpoena issued by the Equal Employment Opportunity Commission with respect to a Commissioner's Charge concerning the Company's recruiting and hiring practices. I further understand that the EEOC has defined the scope of the Charge and subpoena as concerning recruiting and hiring at all Company-owned retail stores, "heavy duty stores," and distribution centers from October 2019 to the present.

4.  Genuine Parts does not have store locations designated as "heavy duty stores." All of the retail store locations are simply categorized as retail stores. However, each store is unique in its focus, and therefore in its recruiting and hiring needs. For instance, some store locations focus on professional or commercial sales, which would include specialized employee roles like Paint Specialist. Other stores focus on agricultural equipment and needs where many employees are Parts Specialists with specialized knowledge. Some stores focus on imported consumer automobiles and have employees knowledgeable about performance parts. There

are a few retail locations that have Machinists, and some others that are hybrid parts/hardware stores.

5.    Employee job titles in the retail stores include Delivery Drivers, Automotive Parts Specialists, Store Managers, Trainees, Customer Service Associates, Driver Dispatcher, Assistant Store Manager, Store Stock Associate, Paint Specialist, Retail Counter Sales, Parts Professional, Outside Salesperson, Store Machinist, Service Shop Parts, and Heavy Duty Parts Specialist.

6.    Stores and distribution centers have different hiring needs. Distribution Centers are Company warehouses where the job titles include Warehouse Loader, Warehouse Associate, Wholesale Manager, General Manager, Warehouse Stockroom Associate, Inventory Control Associate, and Maintenance Associate.

7.    Stores and distribution centers make all of their hiring decisions at the local level. Final hiring authority for in-store roles rests with Store Leadership, which may include Store Managers, Assistant Store Managers, or District Managers.

8.    Currently, any of the following employees may be involved in interviewing candidates for in-store and sales roles, depending on the local practices: Talent Acquisition Specialists; Talent Acquisition Managers; Talent Acquisition Coordinators; Store Managers; Assistant Store Managers; District Managers. Prior to 2024, local hiring managers owned and managed all aspects of the local hiring process. Since that time, some initial screening tasks and scheduling of interviews are conducted by Talent Acquisition personnel who first make sure that candidates meet minimum qualifications for the job.

9.    Interviews are typically conducted at the store level. Local hiring managers decide whether those interviews are in person, by phone, by teleconference, or some other method, and whether a single interview or series of interviews will be conducted. The hiring managers also determine how many candidates to interview for any given position. Some locations use a panel with multiple interviewers. Each location also has the discretion to hire a candidate without an interview, such as when a former employee is rehired, or an employee is highly recommended by another employee, or has extensive experience working in a similar role for a competitor.

10.    The local hiring decisions are based on what that hiring manager believes is the best fit in that location or area of the business. For example, many hiring managers might be looking for a Counter Sales candidate with significant parts knowledge, but another location might find a friendly cashier to be a good fit, if the store already has significant personnel with parts knowledge. As another example, stores in rural areas might experience more agricultural business customers and need a Driver willing to drive longer distances to deliver parts,

whereas city locations may have deliveries closer to the store where Drivers might spend more time in traffic.

11. Each location has the autonomy to source candidates from different hiring sources, including but not limited to third-party job websites such as Indeed, LinkedIn or Monster, online postings such as Craigslist, local advertising, job fairs, and colleges or vocational schools. Some locations also work with local community organizations like the Shepard Center in Atlanta, Georgia to place qualified individuals with disabilities into open roles. Locations may also accept walk-in applicants, or may make "cold calls" to reach out directly to experienced employees working for competitors in their market. In addition, all open positions are posted on https://jobs.genpt.com and can be accessed directly by the general public.

12. Since 2019, some generalized recruiting functions have been performed outside of the store level, such as developing email recruiting campaigns and coordinating participation in job fairs, to increase the talent into the applicant pool, thus increasing good applicant flow. After the second quarter of 2024, recruiters outside of the store level became responsible for contributing to the sourcing, screening, and recommendation of candidates who meet the job requirements in addition to store-level efforts.

13. Despite these adjustments to some of the basic recruiting functions, applicant hiring decisions have been made at the local level the entire time period that the Charge and subpoena concern – from October 2019 to the present.

I declare under penalty and perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 13, 2026, in _High Point North Carolina_ (City/State).

_Kristine Reid_
Kristine Reid